## MARTIN EASTWOOD, plaintiff in error, *v.* THE PEOPLE, defendants in error.

In civil cases, and cases of misdemeanor, if the jury separate, either with or
without the leave of the court, it will not vitiate the verdict without addi-
tional evidence of irregularity or abuse; but in criminal cases of a higher
grade, and especially in capital cases, such a separation, for however short
a time, will be fatal to a verdict against the prisoner, unless it be shown
affirmatively on the part of the prosecution, by the clearest evidence and
beyond a reasonable doubt, that no injury to the prisoner could have occurred
in consequence of the separation.

It is the modern practice of the courts to receive the affidavits of the jurors
themselves in answer to a charge of irregularity or abuse, though they have
generally been considered as an unreliable species of evidence.

If, after a cause has been submitted in a capital case, a jury receive any kind
of evidence which can have the most remote bearing on the case, it will be
fatal to their verdict.

When, in a capital case, after the testimony was closed, several of the members
of the jury, while walking out for exercise, by leave of the court and in
charge of an officer, visited and examined the place where the homicide
occurred, and in regard to which the witnesses had testified, it was held to
be a sufficient reason for granting a new trial.

On the trial of an indictment for murder, alleged to have been committed by
a blow inflicted by the prisoner with a club in a sudden affray, it is admis-
sible to prove that the prisoner was intoxicated at the time of the transac-
tion (a); and, for the purpose of establishing that fact, a witness who was
present at the time and was well acquainted with the prisoner, after describing
the appearance and conduct of the prisoner, may be permitted to give his
opinion as to the fact whether or not the prisoner was intoxicated (b).

MARTIN EASTWOOD was tried and found guilty of the
murder of Edward Brereton, at the Monroe Oyer and Ter-

(a) *Vide The People* v. *Robinson* (2 *Park. Cr. R.*, 235); also, *Same Case*
(1 *id.*, 649).

(b) *Sed vide* the case of *Dewitt* v. *Barley* (5 *Seld.*, 371), reversing the judg-
ment of the Supreme Court, as reported (13 *Barb.*, 550), and holding that, on
a question as to the mental capacity of the grantor in a deed, the opinion of a
witness, founded upon facts within his personal knowledge and disclosed by
him on the trial, is not competent evidence.

miner, in May, 1855, before Welles, justice of the Supreme Court, and the justices of the sessions.

In the course of the trial, *William Green*, called on the part of the defence, testified: That he was a connection of Eastwood, and well acquainted with him; that he arrived at the place of the affray a few minutes after Brereton was knocked down; that Eastwood's appearance was as if something was the matter with him; that he had been accustomed to see men under the influence of liquor and intoxicated.

The counsel for the defence then asked the witness the following question: "From his conduct and deportment and other facts connected with it, state whether, in your judgment, he was, to any considerable extent, under the influence of intoxicating liquors?" This question was objected to by the prosecution, on the ground that it was not competent for the witness to state his opinion; that he must be confined to the statement of facts, &c. The objection was sustained by the court, and the prisoner's counsel duly excepted to the decision.

The witness then testified that, after Brereton was knocked down by Eastwood, he discovered incoherence in Eastwood's speech; that he acted wild and quite different from what he formerly did; that he did not make many remarks; that he looked wild out of his eyes and very blue; that his breath smelt of liquor, &c.

After the verdict had been rendered, the prisoner's counsel moved for a new trial, on the ground that one-half of the jury had, during the trial, separated from their fellows, and gone to the place of the affray, and taken a view of the premises in the absence of their fellows, and in the absence of the prisoner and his counsel, and without permission from the court.

It was conceded, by the public prosecutor and the prisoner's counsel, that, on the evening after the evidence was closed, six of the jurors went, under the charge of one of the constables who had the jury in charge, to the premises in

Eastwood *v.* The People.

question and viewed them; that this was at the request of such jurors; that, after viewing the premises, they returned to their fellows, having been absent about an hour; that, during their absence, no one was permitted to speak to them and no improper conduct took place.; that, when they so left their fellows, it was for a walk for exercise, and without any intention of going to the premises mentioned, but that their walk being somewhat protracted, it extended to the place mentioned, where they stopped and looked around at the localities there, and for the purpose of the better understanding of the same.

The court denied the motion for a new trial, to which decision an exception was taken by the prisoner's counsel.

Eastwood was then sentenced to be executed.

A bill of exceptions having been settled, a writ of error was allowed by Mr. Justice Selden, by which the proceedings were brought before this court, with an express direction in the allowance that the same should operate as a stay of proceedings on the judgment.

On the argument of the cause in this court, affidavits were read by the prisoner's counsel showing the extent and character of the irregularities complained of, the substance of which is sufficiently stated in the opinion of the court (*a*). There was no assignment or joinder in error. (2 *R. S.*, 741, § 23.)

*T. Hastings* and *L. H. Hovey*, for plaintiff in error.

I. It is conceded that writs of error in capital cases, and indeed in cases of felony generally, are matters of favor, and

(*a*) No objection appears to have been taken by the counsel for the prosecution to the reading of affidavits at the general term; nor was it objected that an exception to a decision of the Oyer and Terminer denying a new trial was not available on writ of error. A bill of exceptions, in a criminal case, brings up for review only the decisions made *upon the trial.* (2 *R. S.*, 736, § 21; 4 *Denio*, 9.) A motion for a new trial can only be made in the court where the indictment was tried.

not of absolute right. Courts, in determining the question whether the writ shall issue in a particular case, will therefore exercise a sound judicial discretion, and may, very properly, inquire whether the error has been prejudicial to the accused. But it is insisted that this discretion ends with the allowance of the writ. The only question that can be presented upon the return is, has there been any error? This is the issue and the only issue in the case. The court cannot even inquire whether the error has been injurious to the accused. They must either affirm or reverse the judgment absolutely. After a judgment has been reversed, the court, in its discretion, may either discharge the defendant or order a new trial. (2 R. S., 826, § 26, 3d ed.) 1. At the common law, the Court of King's Bench could not grant a new trial in capital cases. (Rex v. Mowbry, 6 T. R., 638; 1 Arch. Cr. Pl., 177, and cases there cited.) 2. That court, on an issue upon a writ of error, could reverse a judgment for errors apparent on the record, or for errors in the judgment. (1 Arch. Cr. Pl., 198, and cases there cited.) 3. The only judgment authorized by the common law was that of affirmance or reversal. The court, even after the reversal of a judgment, could not order a new trial, until since the passage of an act of parliament, during the reign of the present sovereign, (1 Arch. Cr. Pl., 211, and cases there cited.) 4. The question whether any of the courts of this state have the right to grant new trials to persons convicted of felony, upon the merits, is very far from being settled. Mr. Justice Harris, in the recent case of The People v. Morrison (1 Park. Cr. R., 625), has assumed the ground that such power is vested in the courts of Oyer and Terminer, in a very elaborate opinion, in which he shows that this power is asserted and maintained in eighteen of the sister states. While this right is so freely used for the protection of a few dollars' worth of property, it is not a little singular that it should be repudiated where it might be absolutely essential to the protection of human life. The Supreme Court had previously, however, decided

Eastwood *v.* The People.

the question both ways. ( *The People* v. *Stone,* 5 *Wend.,* 39.) 5. This court began at an early day to exercise its powers in correcting abuses and irregularities in courts of Oyer and Terminer, and of general and special sessions. In the case of *The People* v. *Townsend* (1 *John. Cas.,* 104), this court, acting upon the report of the judge who tried the cause, that the defendant had been convicted of the crime of perjury, and had fled before judgment, and that, after some years, he was again in custody, expressing at the same time the opinion that he was convicted against the weight of evidence, after full consideration, advised the court of Oyer and Terminer to order a new trial. This practice of affording its advice before judgment was followed by a long train of decisions. In 2 *Johnson's Reports,* 381, the case, a conviction for murder, was heard on a case submitted without writ. (2 *John.,* 477 ; 7 *id.,* 413 ; 4 *id.,* 423 ; 13 *id.,* 82, 90 ; 2 *Cow.,* 445 ; 4 *id.,* 26 ; 1 *Wend.,* 91, 198 ; 5 *id.,* 39, 251, 289 ; 7 *id.,* 417 ; 8 *id.,* 636 [heard on a case] ; 9 *id.,* 265 ; 13 *id.,* 159, 351 ; 15 *id.,* 419.) In one instance, this court heard the matter as a case reserved by the Oyer and Terminer. (14 *John.,* 294.) Motions in arrest of judgment have also been frequent, occasionally on affidavits, but more generally upon a writ of *certiorari* or *habeas corpus.* (2 *John.,* 105 ; 18 *id.,* 115, 212 ; 2 *Cow.,* 445.) New trials were often granted on *certiorari,* before judgment, as in *The People* v. *Douglass* (4 *Cow.,* 26.) In all these cases, and in many others, this court exercised the same wide range of discretion that is now exercised on the question whether a writ of error shall be allowed. ( *Case of White,* 22 *Wend.,* 167 ; *of Abbott, for rape,* 19 *id.,* 192 ; *of Rector, id.,* 569 ; *of Cott,* 3 *Hill,* 32 ; *of Hulse,* 1 *Park. Cr. R.,* 611 ; *of Bodine,* 3 *Hill,* 309 ; *of Shater,* 1 *Denio,* 281 ; 4 *Barb.,* 460 ; *of Freeman,* 1 *Comst.,* 9 ; 1 *Park. Cr. R.,* 147, 262, 340, 390.) 6. But prior to the Revised Statutes, the only remedy after judgment was by writ of error ; and the judgment on such writ was always absolute, either for affirmance or reversal.

(3 *John.*, 333; 7 *id.*, 314; 3 *id.*, 505; 9 *id.*, 70; 10 *id.*, 169.) 7. After the Revised Statutes were adopted, the court adopted the practice, on affirming a judgment, of entering an order that it be executed, and on reversal this court either entered an order of discharge or for a new trial. (8 *Wend.*, 595; 13 *id.*, 58, 159; 17 *id.*, 386, 541; 21 *id.*, 509; 25 *id.*, 465; 1 *Hill*, 351; 4 *id.*, 126; 5 *id.*, 294; 1 *Denio*, 9, 19; 4 *id.*, 91, 364, 529; 5 *id.*, 106; 1 *Park. Cr. R.*, 272, 340, 400.) 8. The doctrine from all these cases is obvious. When the court acts upon a case before judgment it will use its discretion, and look into the whole case to see if the conviction was just, and if the accused had had a fair trial, and when they find it so, they will in their discretion disregard technical niceties and irregularities; but when acting after judgment cn a writ of error, the court simply inquires whether there is error. If they find there is, they then reverse the judgment, and if the error can be remedied on a new trial, they add an order to that effect. 9. The reason for this distinction is perfectly apparent. In the one case, the question is, ought we to grant a favor? and in the other, shall we protect a right? Ought we, by our judgment, to establish an unsafe precedent? When the law prescribes a certain course of action, can we with propriety say there is no error in omitting it?

II. The court below erred in disallowing the question put to the witness Green, whether in his judgment the prisoner was, at the time of the homicide, to any extent intoxicated, or under the influence of liquor. 1. The fact testified to by the witness, that he was accustomed to see men intoxicated, and under the influence of liquor, made him an expert. (*Greenl. Ev.*, 489, 490, 1*st* ed.; 1 *id.*, 440, 576, 580, *n*, 2*d* ed.) 2. But the question was proper on another ground. The fact to be proved belonged to that class of facts which can be proved in no other way. (*Greenl. Ev.*, 489, 490, 1*st* ed.; 1 *id.*, 440, 576, 580, *n*, 2*d* ed.; 1 *Stark.*, 54; *McKee* v. *Nelson*, 4 *Cow.*, 355; 2 *Stark.*, 191.) See also Mr. Justice Selden's

Eastwood *v.* The People.

very clear and able opinion in *The Rochester and Syracuse Railroad Company* v. *Budlong* (10 *How. Pr. R.*, 289).

III. The mere separation of the jury was such an error as, upon a proceeding by writ of error after judgment, should be regarded as fatal. 1. By the common law, jurors were to be kept together, without meat, drink, fire or candle, until they agreed upon their verdict, as well in civil as in criminal cases. (*Bacon's Abr.*, *tit.* "*Juries*," G., 369.) Again, a separation in capital cases was not allowed. (*Id.*) 2. However much this rule has been relaxed .in civil cases, not a single decision by the courts of this state can be found, except on applications to the discretion of the court, before judgment, for advice or for a new trial, which has gone the length of saying that such a separation was not error. The case of *Douglass* (4 *Cow.*, 26) was only before the court on application to its discretion. The question is, therefore, still an open one in this state. 3. The rule that jurors should be kept together till they agree upon their verdict rests upon an immovable foundation. The general object of the rule was, to secure an honest, free and impartial or unbiassed verdict. (1.) It was to secure the jurors against the approaches of a corrupt and menacing official administration of tyrannical power. (2.) It was to guard them against bribery by parties or prosecutors. (3.) It was to keep them secluded from the influence of prejudiced individuals and communities, and especially from the influence of public opinion. 4. It is easy to see that, in view of this last particular, there is in this country a very great propriety in adhering strictly to the rule against a separation of jurors during the trial, especially of capital cases. While the press is permitted to spread before the public mind the detail of the crime for which an accused person is on trial, almost every man in the community is compelled, as it were, to make up his mind upon the question of guilt or innocence, and if jurors are permitted to separate or to stand or walk around where they can have access to the public voice or feeling, there can

be little safety in jury trials. 5. Let it be decided and established as the law of the court that it is not error for jurors to separate during a trial and it would be folly to expect them to remain together. Such a decision would clear the door for all sorts of irregularities. 6. It is no answer to this argument to say, as some judges have said, .that actual prejudice or corruption must be proved. Who shall find it out? The unhappy victim? But he is secluded from almost all external knowledge by bolts and bars, and the idea of his proving the fact is but a mockery. There can be no safety but in a strict adherence to the common law rule. 7. The court are to say whether there is error. If they find an error, can they change its name and say there is none? 8. But there are authorities to this point which ought not to be overlooked. The case of *Puffer*, convicted of murder in Pennsylvania (3 *Harris*, 468), is a case, and a very strong one, directly in point. There the jury separated, by permission of the court, on the express consent of the accused; and yet the court, on a writ of error, promptly reversed the judgment, solely on the ground of such separation. See the opinion of the court. ( *Commonwealth* v. *McCall*, 1 *Virginia*, 271; 7 *Humph. Tenn. R.*, 544; 11 *id.*, 502.) In England there has been no application for a new trial on this ground. Resort is in such cases had to the pardoning power. ( *Whart. Am. Cr. L.*, 895.)

IV. But the separation of the jury, connected with the fact that six of them went two miles to the premises, pending the trial, and took a view of the several localities, with the purpose of gaining a clearer insight of the case, without the permission of the court, and in the absence of the prisoner and his counsel, is an error which must be fatal to this conviction. 1. The prisoner had a right to be present and to meet his accusers and their witnesses face to face. He had an indubitable right to see and hear everything that was done or said, either by the court or jury, which might in the slightest degree bear upon the question of his guilt or

innocence. Of this he and his counsel were deprived. 2. A view, in civil actions, was in former times granted by a special order of court, and the special object always was the more certain ascertainment of the facts. (*Bac. Abr.*, 372, *tit.* "*Juries,*" *H.*) 3. These six jurors, therefore, by their view, took evidence bearing upon the issue, and particularly upon the credibility of the witnesses, without permission of the court, and in the absence of the accused. 4. It is no answer to say that the jury meant no harm, or that they were not tampered with. They deprived the prisoner of his right to know and witness everything that could by possibility influence their minds for or against him.

*E. A. Raymond* (District Attorney) and *W. S. Bishop,* for the people.

I. It is a well settled principle of the criminal law that intoxication furnishes no excuse for the commission of crime. (*Whart. Am. Cr. L.,* 46; *Rosc. Cr. Ev.,* 784.) 1. The law holds a person responsible for a criminal act, though at the time he was intoxicated to such an extent as to be unconscious of what he was doing. (*The People* v. *Robinson,* 1 *Park. Cr. R.,* 649; *Rex* v. *Carroll,* 7 *Carr. & Payne,* 145, overruling *Rex* v. *Grindley,* 6 *id.,* 159; *United States* v. *Drew,* 5 *Mason,* 29; *Bennett* v. *The State, Martin & Yerger,* 133; *Cornell* v. *The State, id.,* 147; 1 *Hale,* 32.) 2. If a deadly or highly dangerous weapon be used by the person in effecting the homicide, drunkenness could not affect the consideration of his malicious intent. (*Whart. Am. Cr. L.,* 47; *Whart. Am. Law of Homicide,* 384, 5; *Rex* v. *Meakin,* 7 *Carr. & Payne,* 297; *Rex* v. *Cruse,* 8 *id.,* 546.) In this case, the evidence to prove the premeditated design of the defendant consisted not only in the threats and violent expressions made use of by him at the time, but also in the nature of the weapon, which was a deadly one; in the selection of it; in the preparation for the use of it; in the pursuit after the deceased; in the manner

of inflicting the fatal blow and the attendant circumstances, together with the subsequent flight of the defendant. So 'that, without a word being spoken by the defendant immediately preceding the final affray, the inference would be almost irresistible that the design to kill was premeditated in his mind.

II. But allowing that it was competent to prove the defendant's intoxication, as bearing upon the question of his intent, the opinion of the witness Green was properly excluded. 1. It is a sound and general rule of evidence that testimony should consist of facts and not of opinions. (1 *Greenl. Ev.*, § 440; 1 *Phil. Ev.*, 759.) The two principal exceptions are : First. That the opinions of experts are admissible; Second. That, in a certain class of cases, the opinion of a witness may be received because of his inability, from the nature of the subject, to clearly and intelligibly describe its various features, and the reasons upon which his opinion is based. (1 *Greenl. Ev.*, § 440, *ed. of* 1852, *note*; *Carter* v. *Boehm*, 1 *Smith's Lead. Cas., note.*) (1.) But the opinions of witnesses cannot be received where the inquiry is into a subject matter the nature of which is not such as to require any peculiar habits or study in order to qualify a man to understand it. The most prominent cases on this point are : *McFree* v. *Nelson* (4 *Cow.*, 355); *Culver* v. *Halsam* (7 *Barb.*, 314); *Chary* v. *Chary* (2 *Iredell Law R.*, 78); *Morse* v. *State of Connecticut* (6 *Conn.*, 9); *Rochester and Syracuse Railroad Company* v. *Budlong* (10 *How. Pr. R.*, 290). They are entirely consonant with this modification of the exceptions to the rule. 2. Applying these principles to the present case, the opinion of the witness Green was inadmissible. He was not shown competent to give an opinion.

III. In regard to the separation of the jury, the general rule is, that the verdict will not be set aside on account of their misconduct or irregularity, even in a capital case, unless it be such as affects their impartiality or disqualifies them from the proper exercise of their functions. ( *Whart.*

Eastwood *v.* The People.

*Am. Cr. L.*, 895; *The People* v. *Douglass*, 4 *Cow.*, 26; *The People* v, *Beebe*, 5 *Hill*, 32; *The People* v. *Rawson*, 7 *Wend.*, 423; *The People* v. *Carnal*, 1 *Park. Cr. R.*, 256.) 1. In this state it was formerly held that mere separation without permission was *prima facie* evidence of misbehavior (18 *John.*, 218); but the better opinion now is, that to vitiate the verdict reasonable suspicion of abuse must exist. ( *The People* v. *Douglass*, 4 *Cow.*, 26; *The People* v. *Ransom*, 7 *Wend.*, 423; *The People* v. *Beebe*, 5 *Hill*, 32; *Horton* v. *Horton*, 2 *Cow.*, 589; *Oliver* v. *Trustees*, 5 *id.*, 284.) In New Hampshire the same rule was adopted. ( *The State* v. *Prescott*, 7 *New Hamp.*, 290.) Also in Connecticut. ( *The State* v. *Babcock*, 1 *Conn.*, 401.) Also in North Carolina. ( *The State* v. *Miller*, 1 *Dev. & Bat.*, 500; 1 *Haywood*, 238.) In Georgia and Tennessee it is held that if it be affirmatively shown that no communication was had with other persons after the separation, the verdict will be sustained. (*Hines* v. *The State*, 8 *Humph.*, § 597.) So also in Mississippi. (*McCarn* v. *The State*, 9 *Smede & Marsh.*, 465.) As to the rule in Massachusetts in regard to irregularities of a jury in a capital case, see *The Commonwealth* v. *Robey* (12 *Pick.*, 496). 2. The same rule is established by the English cases and authorities. (1 *Chitty Cr. L.*, 634; 2 *Hale's P. C.*, 306; *Rex* v. *Woolf*, 1 *Chitty R.*, 401; *Rex* v. *Kinnear*, 2 *Barn. & Ald.*, 462.) The case of *The Commonwealth* v. *McCaul* (*Virginia*) constitutes almost the only authority against this rule.

IV. If it be affirmatively shown that there is no reasonable ground to suppose that the separation or any of the subsequent acts of the jury had any influence upon the result of the case, the irregularity will not be deemed sufficient to set aside the verdict. (9 *Smede & Mars.*, 465; *Wilson* v. *Abrahams*, 1 *Hill*, 207, *and cases there cited; Smith* v. *Thompson*, 1 *Cow.*, 221; *The People* v. *Carnal*, 1 *Park. Cr. R.*, 256; *Taylor* v. *Everitt*, 2 *How. Pr. R.*, 23; *Harrison* v. *Rowan*, 4 *Wash. C. C. R.*, 32; *Everett* v. *Youells*, 4 *Barn. & Ald.*, 681; *Whart. Am. Cr. L.*, 897, 899, 901, 903; *Hines* v.

*State*, 8 *Humph.*, 597; *Dana* v. *Tucker*, 4 *John.*, 487.)  1. It
is shown beyond a reasonable doubt in this case, by the affi-
davits which have been read on the part of the prosecution:
First. That the allegation of the defendant, that anything
improper, or in any wise relating to the trial, took place at
the temporary separation of the juror, James Murray, from the
other jurors, on Wednesday evening, is false; Second. That
the same is true in reference to the attempted impeachment
of the conduct of Stephen Charles on the same occasion,
and also of the communication between James H. Wood
and his brother while the cause was being summed up;
Third. That the charge that the constable and a juror drank
liquor at Olmsted's tavern, on Thursday evening, is false;
Fourth. That no communication relating to the trial was
had with the jury on any of these occasions; Fifth. That
the only act of the jury of which there is no dispute, upon
any of these occasions of which the defendant complains, is
the view which some of them had of the scene of the homi-
cide, on Thursday evening.

V. The important inquiry, therefore, is, whether the view
of the scene of the homicide, in its effect upon the minds of
these jurors, was prejudicial to the prisoner. That such was
not the effect appears from the affidavits of the six jurors
who visited the ground. 1. The agreement to a verdict of
guilty against the defendant was not induced by its effect on
their minds, either in whole or in part. 2. There was no
substantial disagreement between any of the witnesses as to
the localities, which required consideration; and no testi-
mony relating to them which needed explanation. 3. No
issue was made in the course of the trial upon the localities,
or upon the position of any of the witnesses, or of the
deceased and of the defendant.

VI. Unless this view of the premises can be shown to
have operated unfavorably towards the defendant, the ver-
dict should not on that account be set aside. (2 *Hale P. C.,*
306; *Hudson* v. *The State,* 9 *Yerger,* 468; *Rex* v. *Sutton,* 4

*M. & S.*, 532; *Whart. Am. Cr. L.*, 903; *The People* v. *Carnal*, 1 *Park. Cr. R.*, 256, 260; *Taylor* v. *Everett*, 2 *How. Pr. R.*, 23; 1 *Arch. Cr. Pl.*, 178.)

VII. The separation of the jury, and the subsequent conduct of the six jurors, in a case of this magnitude, may subject them to animadversion and fine, but it should not set aside the verdict rendered in this case, which is entirely in accordance with the facts proved, and the law, as laid down by the court in their charge.

*By the Court*, SELDEN, J. I will first consider that branch of the motion which is founded upon certain alleged irregularities on the part of the jury. The affidavit of Cornelius Fielding states that on the evening of Wednesday, May 9th, 1855, being the third day of the trial, several of the jurors passed him on New Main-street, in Rochester, about three-fourths of a mile from the court-house, and stopped at Stillson's block, at the corner of New Main and Franklin streets; that he immediately crossed over towards them and went into Coatsworth's grocery store, situated upon the corner, and as he was going in he saw Stephen Charles, one of the jurors, in the store, about thirty feet from the door, talking with Coatsworth, and in company with another person who was neither an officer nor a juror; that the three continued in conversation some time; that he distinctly heard their voices but could not understand what they said; that while this conversation was going on, James Murray, another of the jurors, who lived in the upper part of Stillson's block, spoke and said he was "going up to see his folks," and immediately separated from his fellows and went up stairs; that he, Fielding, remained in the store some five minutes or more, and then went out and found three or four of the jurors only at the entrance where they stood when he went in; "*the rest except Murray having left.*"

This affidavit is corroborated in all its essential features by the affidavits produced on the part of the prosecution;

Eastwood *v.* The People.

for while nine of the jurors depose that, upon the occasion referred to by Fielding, when they stopped at the entrance to Stillson's block, they neither saw nor knew that Stephen Charles, one of their number, went into the store of Coatsworth, or separated at all from his fellows, yet Charles himself, who was foreman of the jury, testifies that he did go into the store and held conversation with Coatsworth, of one or two minutes, in regard to some private business of his own; and this is still further confirmed by the affidavit of Coatsworth, who says that he had such conversation with Charles at his store at some time during the sitting of the court at which Eastwood was tried. He says, it is true, that he thinks it was in the daytime, and after the jury was discharged; but in this he is contradicted by both Fielding and Charles, and is evidently mistaken. Charles says that he has no recollection that any third person was present at his conversation in the store, and both he and Coatsworth say they did not see Fielding, and yet the latter must have been there.

Again, eight of the jurors contradict Fielding's statement, that a portion of the jurors left their position at the entrance to the apartments of Murray during his absence, and yet it is clear that Fielding is correct in this; because he is supported in the statement by Murray himself, by Doty, another of the jurors, and by Targee, one of the constables having the jury in charge. The latter says that while Murray was gone, "several persons began to gather around the jurymen, and at the suggestion of the deponent, Olmsted, the other constable, started on with some of the jurymen upon Franklin-street, *to avoid the crowd of persons beginning to gather around them.*" There is no doubt therefore of the general accuracy of Fielding's statement. These are the facts upon which the first allegation of irregularity is based.

The second rests upon the affidavits of Osborn Hanford and C. F. Backus; Hanford states that he resides in the immediate vicinity of the scene of the homicide; that on the evening of Thursday, May tenth, which it appears was

Eastwood *v.* The People.

just after the testimony was closed, but before the case was summed up, he saw six or eight of the jurors go to and examine the ground where the blow which killed Brereton was given, which is about two miles from the court-house; that they then crossed the road to his, deponent's, residence, where Mr. Hobbie, one of their number, opened the gate, stepped into the yard and placed himself upon the spot where his, Hanford's, daughter Elizabeth had testified upon the trial that she stood when she saw the defendant strike the deceased, and then turning his head and looking towards the place where the deceased fell, remarked that Miss Hanford had a good view from that point, and could see all that occurred. Hanford states that Stephen Charles, another of the jurors, remarked that deponent's daughter Elizabeth was the only man on the ground, as she was the only one who tried to prevent Eastwood from striking Brereton.

Backus confirms the statement of Hanford in respect to the visiting by the jurors of the ground, and as to one of the jurors placing himself within the gate at Hanford's house; and also states further that the jurors stopped at the pump in front of Olmsted's tavern, and while there the constable in whose charge they were went into the tavern and did not return until the jurymen had all left, and had gone eighty or one hundred rods towards the city; that a great many persons were passing in the street at the time, and the jury were not together or near each other, but were scattered along, some rods apart.

To meet these statements the affidavits of the six jurymen who visited the ground, with that of the constable who attended them, were produced. They state that on Monday, the first day of the trial, the judge who presided, in the presence of the prisoner and his counsel, and without objection on their part, gave permission to the jury to walk in the open air for recreation after the adjournment of each day, attended by the two sworn officers, without restriction as to the limits or direction of their walk; that on Thursday, after

the testimony was closed, and after tea, six of the jurymen requested Targee, one of the constables, to attend them upon a walk, which he consented to do; that the other six jurors said they preferred to remain at the hotel; that James H. Wood, one of their number, a brother of the superintendent of the House of Refuge, proposed that they should walk in that direction, which they accordingly did; that after reaching the House of Refuge they concluded to walk on, and five of the jurors say they approached the scene of the homicide before they were aware of it; but Stephen Charles, the foreman, and Targee the constable, both say that, after getting nearly there, one of their number said in substance that as they had gone so near the ground they might as well go on down there. They all say they had no other motive but curiosity in visiting the ground; that there was no controverted point of evidence which could be affected by it; and that their verdict was not in the least influenced by the view of the scene thus obtained. Charles also confirms Hanford as to the remark to the latter in respect to his daughter being "the only man on the ground," and although the six jurors all say that they left Olmsted's tavern in company with Targee, the constable, yet the affidavits of Targee himself, and of John Sweeney, the bar-keeper at the tavern, both produced on the part of the prosecution, go strongly to corroborate that of Backus upon this point.

Backus says that while the constable was in the tavern something was said about a bill which the constable offered to the bar-keeper, and that the former did not leave the bar-room until the jurors had all left and gone eighty or one hundred rods. Targee admits that the jury had all started for the city before he left the tavern, but says they had gone only a few rods; that he bought a single cigar at the bar and paid for it by a one dollar bill, and received the change, and denies that anything whatever was said about the character of the bill. Sweeney, on the contrary, says that Targee handed him a one dollar bill which he at first sup-

Eastwood v. The People.

posed was bad, but finally ascertained was good, being so informed by Backus. The affidavit of Backus, therefore, seems to be pretty fully confirmed in all respects except one. He states that Targee bought liquor at the bar instead of a cigar, but this is contradicted by both Targee and Sweeney, and conceded by the prisoner's counsel to be an error. It appears that Backus was sitting upon the porch in front of the tavern, and his supposition that the bill was offered in payment for liquor was probably a mere inference. The only other discrepancy between his statement and that of Targee is as to the distance which the jurors had gone when the latter left the tavern. These are the essential facts relied upon to support this branch of the motion. The question is, are the irregularities thus shown sufficient to vitiate the verdict?

The early doctrines of the common law in regard to the misconduct of jurors have been greatly modified in more modern times. It seems to have been regarded by the older writers as an inflexible rule that after the jury were once sworn and the trial commenced, they could not, in either a civil or criminal case, be permitted to separate, except in cases of evident necessity, and that any unauthorized separation would be fatal to the verdict. (*Co. Litt.*, 227; *Fost.*, 27; *Trials per Pais*, 249; 4 *Bl.*, 360.) This rule, however, began at an early period to be relaxed in civil cases and cases of misdemeanor. In the case of *Lord St. John* v. *Abbot* (*Barnes*, 441), cited by Judge Cowan in his note to *Smith* v. *Thompson* (1 *Cow.*, 221), two or three of the jurymen, after the cause had been submitted to them, separated from their fellows and came into the court. The judge, on being informed that they were in court, asked them what they did there, to which they answered that they could not agree, whereupon they were sent back to their fellows, and afterwards a verdict was found for the plaintiff. The court was of opinion that the jury were punishable for their mis-

conduct, but that it was not sufficient cause for setting aside the verdict.

The rule which seems to have been adopted in that case has been followed ever since, and is still the rule in this, if not in other states, as well as in England, viz., that the party who seeks to avoid a verdict in a civil case, on the ground that the jury have separated, whether such separation be with or without the authority of the court, must show affirmatively that the separation has, or may probably have had, some effect upon the verdict.

The cases of *Smith* v. *Thompson* (1 *Cow.*, 221), *Horton* v. *Horton* (2 *id.*, 589), *and ex parte Hill* (3 *id.*, 335), are sufficient to show the ruling of the courts in this state on the subject. That the rule in cases of misdemeanor is the same is abundantly settled both in this country and in England. In *Bul. Nisi Prius*, 308, it is said that " At the present day it appears that the jury will not be permitted to disperse, after they have retired for the purpose of considering their verdict; although in a case of misdemeanor, a dispersion of the jury, *with the judge's concurrence*, on an adjournment taking place during the progress of a trial, will not be sufficient to avoid a verdict." Later authorities show that when the dispersion is without the authority of the judge, although the jurors themselves may be punished, the rule so far as the validity of the verdict is concerned is the same. The leading case on the subject is that of *Rex* v. *Woolf* (1 *Chitty* 401), which was an indictment for a conspiracy. There, on motion to set aside a verdict on account of the separation of the jury, all the cases were examined, and it was finally held that " in cases of *misdemeanor*" the dispersion of the jury alone is not sufficient to vitiate a verdict. The separation in that case was by permission of the court; but upon this subject Abbott, Ch. J., said : " The only difference that can exist between the fact of the jury separating with or without the approbation of the judge, as it seems to me, is this : that if it is done without the consent or approbation of the judge,

Eastwood *v.* The People.

express or implied, it may be a misdemeanor in them, and they may be liable to be punished."

In the later case of *Rex* v. *Kinnear* (2 *Barn. & Adolph.*), where the jury separated without leave of the court, this opinion of Ch. J. Abbott was approved and adopted. In this state the rule is the same, and no distinction whatever is made between cases of misdemeanor and civil cases. (*The People* v. *Alcott*, 2 *John. Cas.*, 301; *The People* v. *Beebe*, 5 *Hill*, 32.)

But the question we have now to consider is whether the same rules are to be applied to criminal cases of a higher grade, and especially to capital cases. In *The People* v. *McKay* (18 *John.*, 212), Spencer, Ch. J., in giving his opinion, refers to a case in which this question arose. He says: " A case analogous in principle occured in Ontario county, in 1814. A woman of color was indicted and tried for murder and found guilty. The jury had separated, after agreeing on a verdict, and before they came into court, and *on that ground* a new trial was granted." This, so far as appears, is the only authority in this state directly upon the point. There are, however, subsequent *dicta* which it is necessary to examine.

In *The People* v. *Ransom* (7 *Wend.*, 41), after referring to several of the civil cases bearing upon the question, Sutherland, J., says: " That the doctrine upon this subject is the same in criminal, and *even in capital cases*, as in civil, is clearly settled." He then refers to *The People* v. *Douglass* (4 *Cow.*, 26), and after briefly stating the facts, says: " Upon an application for a new trial for this misconduct of the jury, *each of the judges* expressed a decided opinion that the mere separation of the jury, though in violation of their duty and against the express directions of the court, and although *in a capital case*, would not of itself be a sufficient cause for setting aside the verdict."

These *dicta*, together with what was said in *The People* v. *Douglass* (*supra*), have been treated as unsettling the law

upon this question in this state.   Mr. Wharton, in his work
on *American Criminal Law*, after stating the rule in several of
the states, says: "In New-York, mere separation without
permission appears formerly to have been considered *prima
facie* evidence of misbehavior," citing the opinion of Spencer,
J., in *The People* v. *McKay*.   "But," he proceeds to say,
"the better opinion now is, that to vitiate the verdict,
reasonable suspicion of abuse must exist," for which he cites
*The People* v. *Douglass,* and *The People* v. *Ransom* (*supra*).
It is very doubtful, however, whether the somewhat loose
*dicta* of the judges in these two cases, which were entirely
*obiter,* ought to be considered as overthrowing the direct
decision upon the point referred to by Chief Justice Spencer,
in *The People* v. *McKay*, even if they were the only autho-
rities upon the subject.   Besides, it will be seen on exami-
nation that the remark of Judge Sutherland, in *The People*
v. *Ransom,* in regard to the opinions of the judges in *The
People* v. *Douglass,* is not fully borne out by the latter case ;
for while it is true that Judge Woodworth does in that case
say, in substance, that the mere fact of separation, unaccom-
panied by any further evidence of abuse, is not sufficient to
avoid the verdict even in a capital case, to which Judge
Sutherland himself may perhaps be considered as having
given a *quasi* assent, yet Chief Justice Savage expressly
reserves his opinion upon the point.   He says: "*Upon so
grave a question as* that of the life or death of a fellow-citizen,
*I am not prepared to say* that the separation of the jury con-
trary to the instructions of the court, and mingling with the
throng about the court-house, should not affect their verdict ;
but I do not deem it necessary to express an opinion upon
this point."

There is at most, therefore, so far as this state is concerned,
but the mere *obiter dicta* of two judges to oppose to the direct
decision of the Supreme Court in 1814, confirmed as it is by
the reference to it by Chief Justice Spencer, in *The People* v.
*McKay*.   But if it be doubtful which of these opinions ought

to prevail, if taken by themselves, there is an overwhelming preponderance of authority in other states in favor of the earlier decision. The leading case on the subject in the United States is that of *The Commonwealth* v. *McCaul* (1 *Virginia*, 271). The case was ably and elaborately argued by the late William Wirt for the prisoner and Attorney-General Nicholas for the commonwealth; and it was there unequivocally held that the mere separation of a jury in a capital case, unless from absolute necessity, is sufficient to vitiate the verdict, and that it is not necessary for the prisoner to give affirmative evidence of any additional abuse. The principle of this case has been generally followed by the courts in this country, with, however, this addition, not at all inconsistent with it: that when it is affirmatively shown on the part of the prosecution that no injury could have resulted to the prisoner from the separation, the verdict will not be set aside.

As the principle we are considering is of the highest importance, and as it is desirable, in view of the strong interest the case has excited, that the correctness of our conclusions should be clearly established, I feel justified in bringing under review a few of the later American cases, in the order in which they have arisen. The first which I shall notice is that of *The Commonwealth* v. *Roby* (2 *Pick.*, 496), decided in 1832. In that case the question we are now considering did not directly arise, the irregularity complained of consisting of the jury being furnished, by the officer having them in charge, with food and drink, while deliberating upon their verdict. But Ch. J. Shaw, in the course of his opinion, refers to the decision of the General Court of Virginia, in the case of *The Commonwealth* v. *McCaul*, and then says: "The court in New-York, in *The People* v. *Douglass*, intimated that this went somewhat further than the common law. Whether it would be adopted as a rule here it is not necessary to inquire. *It is manifest that by such separation the jury might be thus exposed.*" Again, he says:

" The result of the authorities is, that where there is an
irregularity which may affect the impartiality of the pro-
ceedings, as when meat and drink and other refreshment
has been furnished by a party, or when the jury have been
exposed to the effect of such influence, *as where they have
improperly separated themselves, or have had communication not
authorized, then, inasmuch as there can be no certainty* that the
verdict has not been improperly influenced, the proper and
appropriate mode of correction and relief is by undoing what
has been improperly and may have been corruptly done."
This language of the learned chief justice shows conclusively
that he concurred in the decision of the General Court in
Virginia, rather than the *dicta* of the judges in *The People* v.
*Douglass.* The next case is that of *The State* v. *Prescott* ( 7
*N. Hamp.*, 287 ). In this case, where the jury had separated,
the Supreme Court of New Hampshire expressly dissented
from the doctrine of Judge Sutherland, in *The People* v.
*Ransom.* After quoting some of his remarks, Parker, J.,
says : " But we think there is another principle which should
also be applied in a criminal case, which is, when there has
been an improper separation of the jury during the trial, if
the verdict is against the prisoner he is entitled to the benefit
of a *presumption* that the irregularity has been prejudicial to
him ; *and that it is incumbent upon the government to show, and
that beyond a reasonable doubt*, that the prisoner has suffered
no injury by the departure from the forms ordinarily pursued
in the administration of justice." This is the precise doctrine
for which I contend, and is stated in the clearest and most
unequivocal terms ; but as I desire to leave no doubt of the
correctness of my conclusion upon this point, I shall not
rest the argument here.

In the case of *McLain* v. *The State* ( 10 *Yerger*, 241 ), a
portion of the jury had several times separated from their
fellows, and remained absent fifteen or twenty minutes, with-
out being under the charge of an officer. The court set aside
the verdict, and Yusney, J., in giving his opinion, cites and

expressly approves of the case of *The Commonwealth* v. *McCaul.*
In reference to that case he says: " The separation of the
jury in that case was not under more exceptionable circum-
stances than in this; neither was there proof of any actual
tampering or conversation on the subject of the trial with
the jurymen. The court held that it was not necessary that
this should be proven in order that the verdict should be set
aside and a new trial granted. This decision is, we think,
supported by English authority."

A few years later, the case of *Overbee* v. *The Commonwealth*
( 1 *Robinson,* 756) occurred in Virginia, in which the court
having given five of the jurors leave to retire for a few
minutes, attended by an officer, a sixth started after them
unobserved by the court. This juror not returning with the
other five, an officer was immediately sent to bring him in,
which he did about a minute afterwards. There was a
crowd about the door, but the juror testified that he held no
communication with any one; and yet the court set aside the
verdict.

In the case of *Hines* v. *The State* ( 8 *Humph.,* 597), one
of the jurors absented himself from the others ten or fifteen
minutes. He testified that his absence was owing to indis-
position, and that he had no communication with any one;
but the court nevertheless granted a new trial.

The Supreme Court of Mississippi, in the case of *McCann*
v. *The State* ( 9 *Smedes & Marsh.,* 465), held, upon an indict-
ment for murder, that when any portion of the jury have
separated from the others and had intercourse or opportunity
of intercourse with third persons, and it shall not affirma-
tively appear that no effect was produced upon the jury by
such exposure, and the possibility of undue influence be not
wholly negatived, the verdict will be set aside.

In the subsequent case of *Boles* v. *The State* ( 13 *Smedes
& Marsh.,* 398), which was also an indictment for murder,
and in which, while the jury were deliberating, a barber had
been admitted to their room and remained an hour or more,

and the jury had sat by the side of others at the table; the same court set aside the verdict, although the officer testified that he had heard no one speak to the jury about the case, and there was no proof that a word had been said by the barber on the subject of the trial.

In the case of *Peiffer* v. *The Commonwealth* (3 *Harris*, 468), in which the prisoner was indicted for the murder of his wife, after the jury were sworn, in consequence of a press of business in the quarter sessions, they were allowed by the express authority of the court, and with the consent of the prisoner's counsel, to separate and go to their respective homes, under an arrangement that they should return on a particular day of the term to attend to the trial. The prisoner was convicted, and, upon writ of error, the conviction was reversed and a new trial ordered.

The Supreme Court of Tennessee also held, in the case of *Wesley* v. *The State* (2 *Humph.*, 502), that a circuit court has no power in a capital case to authorize the separation of the jury, even with the consent of the prisoner and the counsel for prosecution.

These cases when combined produce a weight of authority far greater, in my view, than would be required to overbalance the *obiter dicta* of the two judges in the case of *The People* v. *Douglass.* They establish incontrovertibly the doctrine that, while in civil cases and cases of misdemeanor, if the jury separate, either with or without the leave of the court, it will not vitiate the verdict, without additional evidence of irregularity or abuse, yet that in criminal cases of higher grade, and especially in capital cases, such a separation, for however short a time, will be fatal to a verdict against the prisoner, unless it is shown affirmatively on the part of the prosecution, by the clearest evidence and beyond a reasonable doubt, that no injury to the prisoner could have occurred in consequence of the separation.

Let the present case, then, be tested by these principles. We will look first at the irregularity disclosed by the

Eastwood *v.* The People.

affidavit of Fielding.    It is undisputed that Murray, one of
the jurors, separated from his fellows, entered the so-called
Stillson block, in which he resided, and was absent, accord-
ing to the statement of Fielding, in which he is confirmed by
Targee, the constable, five minutes.    During this time he
was beyond the observation either of the constable or of any
of his fellow-jurors, and the only explanation of what had
occurred is from his own affidavit.    It was once held that
the affidavits of jurors could not be received at all to repel
a charge of irregularity.    In the case of *Taylor* and *Webb,*
which arose in 1653, a motion was made to set aside the
verdict because some writings had been delivered to the jury
by a stranger.    Lord Hale, who was counsel in the case,
and opposed the motion, produced the affidavit of the fore-
man of the jury that they had not looked at the writings.
But the court refused to listen to the affidavit.    Rolle, Ch. J.,
said : " The affidavit of the jury ought not to be allowed to
make good their own verdict ; for now they are, as it were,
parties, and have offended, and shall not be allowed by their
own oath to take off their offence." (*Trials per Pais,* 225 ;.
*Viner's Abr. Trial,* 448, pl. 6.)

But, notwithstanding this early decision, it has no doubt
been the practice of the courts to receive the affidavits of
the jurors themselves in answer to a charge of irregularity
or abuse.    They have, however, generally been considered
as an unreliable species of evidence.    In *Commonwealth* v.
*McCaul* (*supra*), Wilson, J., says : " From the mode in
which collusion and tampering is generally carried on, such
circumstance is generally known to no person except the
one tampering and the one tampered with, or the persons
between whom a conversation might be held which might
influence the verdict.    If you question either of these per-
sons on the subject, he must criminate or declare himself
innocent, and you lay before him an inducement not to give
correct testimony."

In the case of *Hines* v. *The State* (8 *Humph.*, 597), the court say: "The only witness who gives any explanation whatever is the offending juror. This affidavit, it is true, excludes the possibility that he was tampered with, if his testimony shall be deemed sufficient to establish the fact. But we do not think this affidavit can be relied on as proof of the innocence of his conduct." But admitting that the affidavit of a juror who separates himself from his fellows is alone sufficient to repel the presumption of danger to the prisoner which arises from the bare fact of separation, what does the affidavit of Murray in this case show? He simply says that "he did not say a single word, directly or indirectly, to a single person, after leaving the jury until his return to them, about the trial or the subject matter thereof." He does not say who was in the house into which he went, how many persons he saw while there, nor what was said to him or in his hearing. It is not so much what jurors say to others that is to be guarded against as what others say to them. This affidavit affords no evidence whatever that the juror, while absent, did not hear remarks of the most improper character, which might have influenced him in regard to the verdict. I concede this to be improbable. But is probability enough where life is at stake? As was said by Parker, J., in *The State* v. *Prescott* (*supra*), "these irregularities may not have affected the prisoner, but that is not enough. Even if it was probable they had not, mere probability would not suffice." If the separation of the juror Murray from his fellows was the only irregularity in the case, the strict legal rule would require us to say that it was not fully explained. But this is not all. The foreman of the jury, Charles, also left his associates, entered a store, and had a conversation of some minutes with the proprietor, Coatsworth, upon private business of his own, without the consent or even knowledge of the officer having the jury in charge. This was highly improper, but if fully explained would not vitiate the verdict. The affidavit of Charles,

Eastwood *v.* The People.

produced in explanation, is more full than that of Murray, and supported, as it is to some extent, by that of Coatsworth, may perhaps be regarded as sufficient to show that the verdict could not have been affected by the circumstance. But the affidavit of the officer, Targee, discloses a fact of serious import. He says that while Murray was absent, "several persons began to gather around the jurymen," and that at his suggestion the other officer, Olmsted, "started on with some of the jurymen upon Franklin-street to avoid the *crowd of persons* beginning to gather around them." It is to be inferred that the persons gathering around them knew that they composed the jury in Eastwood's case. What was said by the persons composing this crowd? Of this we are not informed. It is true that all the jurors whose affidavits were read testify that they held no communication, directly or indirectly, with any person in regard to the trial during their absence from the hotel. I am disposed to consider this as equivalent to saying that they heard no remarks from any one bearing on the subject; but there are two of the jurors from whom no affidavit is produced: who shall speak for them? It is true that those jurors whose affidavits are produced severally swear that neither they themselves, nor any other of the jurors, to their knowledge, held any communication with any person at any time during their absence from the hotel, and this is confirmed by the affidavit of Targee; but when it is considered that not one of them, as they all swear, including the constable, Targee, was aware of the fact that the foreman, Charles, went into the grocery and had a conversation there of some minutes with Coatsworth, it may readily be seen how much their affidavits, as to what others did, are, under the circumstances, worth.

Now, in view of the fact, testified to by Targee, that the jury, while waiting for their associate, Murray, were so pressed upon by the crowd that the officers were compelled to separate them into two parties to avoid the throng, are we not bound to hold that the interest manifested by the

crowd on this occasion creates a probability that something was said in relation to the case of Eastwood which should be met and repelled? In the language of Parker, J., in the case of *The State* v. *Prescott* (*supra*), we may with propriety say: "If, in this resort to so public a place by jurors, during a trial which excited great interest, some of them did not hear remarks relative to the trial, or the guilt or innocence of the prisoner, *it would be a remarkable evidence of caution on the part of the spectators generally*; much greater caution than is usually exercised in such places upon like occasions." Assuming, then, that it is satisfactorily shown that none of the ten jurors whose affidavits are produced heard any remarks from the crowd (a point upon which their statements are by no means explicit), how does it appear that the other two jurors heard nothing? In my view, we are without any reliable evidence on that subject, in respect to which the burden of proof was clearly thrown upon the prosecution.

But there is another irregularity to which, notwithstanding the prolixity into which I have been unwillingly led by my desire to make this matter clear, I feel bound to give a moment's attention, viz., the visit of the six jurors to the scene of the homicide. I shall, however, pass over all the details of this visit, and all exposures to improper influences connected with it, except in a single aspect. It is a well settled rule that if a jury, after a cause is submitted to them, receive any kind of evidence which can have the most remote bearing upon the case, it will be fatal to their verdict. So scrupulously is this rule adhered to, that when the solicitor for the plaintiff, after the evidence was concluded, delivered a bundle of depositions to the jury, a portion of which were not in evidence, a verdict for the plaintiff was set aside, though the jury swore they had not opened the bundle. (2 *Hale's P. C.*, 308.) In a case in Massachusetts, where a paper having some relation to the suit got into the hands of the jury by mistake, the court set aside the verdict, and

refused to hear the testimony of the jury, that the paper had no influence upon their finding. (*Whitney* v. *Whitman*, 5 *Mass.*, 405.) It was held in an old case that if the jury send for a book, after departure from the bar, and read it, the verdict is voided. (*Viner's Abr. Trial*, 451, *pl.* 18.) And Lord Tenterden, on one occasion, refused to send to the jury a law book which they requested, although the counsel on both sides consented. (*Burrows* v. *Unwin*, 3 *Carr. & Payne*, 310.) In a comparatively modern case it was held that any communication, even from the court, not made in open court and before the parties, will avoid the verdict. (*Sergeant* v. *Roberts*, 1 *Pick.*, 337.)

Suppose, then, the jury in this case had applied to the court for leave to take to their room a map of the ground where the homicide was committed, and the court, without the knowledge of the prisoner or his counsel, had granted their request, is there any doubt, in view of the authorities to which I have referred, that it would have vitiated their verdict? I apprehend there can be none; nor that, if the request granted had been to visit the ground, the effect would have been the same. Will it be contended that if the jury do that, of their own accord, which the court, if applied to, would have no power to authorize them to do, the verdict can stand? This cannot be maintained.

It is said that the jury were walking for recreation merely, pursuant to the leave given them by the court, and that their coming upon the ground in question was purely accidental; and such would be the inference from the affidavits of several of the jurors; but Charles, the foreman, testifies that, as they approached the place, one of their number remarked that " as they had got so near the ground they *might as well go on down there*," and in this he is confirmed by the affidavit of the officer, Targee. It is obvious, therefore, that their visit to the ground was intentional. Whether this visit had in fact any influence upon the verdict or not, the court will not inquire. It is plain that, in many cases,

a view of the localities concerning which the witnesses had testified would have a weighty influence in determining the credit due to such witnesses, and it could hardly fail, in any case, to have more or less effect either to confirm or weaken the force of their testimony.

If we are to exercise in this state the same care for the lives of its citizens, and the same scrupulous regard for the purity and impartiality of the administration of justice, which is manifested in other states, it is in my opinion clear that the irregularities already commented upon, to say nothing of others to which I have not adverted, are sufficient to entitle the prisoner to a new trial.

But, notwithstanding this conclusion, I think it incumbent upon me to notice that branch of the motion which is founded upon the exceptions taken at the trial.

It appears from the bill of exceptions, that the death of Brereton was produced by a blow inflicted by the prisoner with a club, in a sudden affray between the deceased, Edward Brereton, and Daniel Brereton, on the one part, and the prisoner, Eastwood, and one La Rock, on the other.

The evidence of a premeditated design by the prisoner against the life of Brereton, which had the effect to produce a conviction of murder instead of manslaughter, consisted in certain expressions used by the prisoner in the course of the affray. He said a number of times that he would "kill" the deceased; and just before striking the fatal blow, on being told that if he struck the deceased he would kill him, he said, "I mean to kill him;" and shortly after the blow, when told he had killed the man, he replied, "I meant to kill him."

In the course of the trial one Green was called as a witness for the defendant, and testified that he was present at the affray; "that he noticed the prisoner, with whom he was well acquainted; that something ailed him; that he appeared strange and wild, and acted quite differently from his usual manner; that he talked incoherently, and gave answers to

questions which were foreign to the purpose, and that his breath had the smell of liquor." He further said, that he had been accustomed to see men who were intoxicated.

The counsel for the prisoner then asked the witness whether or not Eastwood, at the time of the affray, was in any degree intoxicated. To this question the district attorney objected, on the ground that it called for the opinion of the witness, and insisted that the witness could only be permitted to give the facts, that is, to describe the appearance and conduct of the prisoner, leaving it for the jury to judge, from this description alone, whether he was intoxicated or not. The court sustained the objection and excluded the evidence, to which the counsel for the prisoner excepted. This exception presents one of the principal grounds upon which the prisoner's counsel relies to obtain a new trial.

That it was of great importance for the jury to know whether the prisoner was or was not intoxicated is obvious. It clearly did not necessarily follow, because the prisoner used the expressions I have referred to, that he really entertained the design which the words import. It not unfrequently happens that, when men are wrought up to a pitch of phrenzied excitement by intoxication or by passion, their language assumes a degree of violence far beyond any deliberate purpose which they have formed. Instances of this kind must have come under the observation of every man of experience. The very affray in question presents one which is strikingly illustrative of the truth here asserted. The companion of the prisoner, La Rock, had been severely beaten and bruised by Brereton, and when afterwards, having armed himself with a club, he struck Brereton a blow which felled him to the ground, he said: "Damn you, you have *killed* me, and I'll *kill* you."

The prominent word here used is the same as that used by Eastwood, and upon the strength of which he was convicted of murder instead of manslaughter; and yet it could

hardly be contended that, when used by La Rock, it was indicative of an actual design to destroy the life of Brereton. This use of the word "kill," by the companion of Eastwood, and his partner in the affray, together with the frequent use of the same word by Eastwood in the early part of the quarrel, and before his passion had risen to the pitch it afterwards attained, naturally suggest the possibility of a habit existing between the two of using this word as descriptive of a degree of bodily injury less that mortal.

I refer to this simply to show how important it was that the jury, who were to pass upon the delicate question of intent, upon which hung the life of Eastwood, should be possessed of every proper means of judging of his actual condition. If the mental disturbance arising from intoxication was added to that produced by excited passion, it would, of course, have a bearing upon the question to be tried. The evidence offered, therefore, was clearly material, and the question presented is, whether, upon an inquiry as to the intoxication of an individual at a particular time, the opinion of one who was present, and had full opportunity to judge, can be received.

It is a sound general rule, that testimony should consist of facts and not opinions; and this rule is to be departed from only in cases of necessity. As, however, the object of judicial investigations is to ascertain truth, whenever the opinions of witnesses are necessary to enable the jury to form a clear and accurate judgment upon the subject of inquiry, they are to be received. To reject them, under such circumstances, would be to reject the only light by which the jury could be guided to a safe conclusion.

All such cases are exceptions to the general rule, that opinions are not evidence. Upon all questions of science, or those relating to some art or trade, the opinions of experts, *i. e.*, of persons skilled in the particular science, art or trade, are necessarily resorted to; this forms the most prominent and familiar class of exceptions. But the

authorities show another class, equally well defined, and founded upon reasons no less cogent, although not so universally recognized. I will refer to a few cases belonging to the latter class.

In the case of *McKee* v. *Nelson* (4 *Cow.*, 355), which was an action for breach of promise of marriage, a witness living with the plaintiff, and having daily opportunities of observing her conduct, was permitted to give his opinion whether the plaintiff was sincerely attached to the defendant.

It has been repeatedly, and, as I think, with the most obvious propriety, held that, upon questions relating to the sanity or mental capacity of the grantor in a deed, witnesses familiar with such grantor, and having the means of judging of his mental condition, may be permitted to give their opinions. (*Culver* v. *Hoslam*, 7 *Barb. S. C. R.;* *De Witt* v. *Barley*, 13 *id.*, 550.) (a)

In *Morse* v. *The State of Connecticut* (6 *Conn.*, 9), Chief Justice Hosmer held that a witness might be permitted to give his opinion as to the age of an absent person at a particular time, provided he accompanied his opinion by a statement, as far as practicable, of the fact indicative of the age.

The ground upon which opinions are received in all these cases are the same, viz., the impossibility of adequately describing in language those minute facts and appearances upon which a judgment, as to the main act, must necessarily depend.

There are obviously many other cases falling within the same reason, and to which, of course, the same rule should be applied. One such case is very forcibly presented by Gaston, J., in the case of *Clay* v. *Clary* (2 *Iredell L. R.*, 78). He says: "And so it is in regard to questions respecting *the temper in which words have been spoken or acts done:*

(a) Overruled. (5 *Seld.*, 371.)

Were they said or done kindly or rudely, in good humor or in anger, in jest or in earnest? What answer can be given to these "inquiries, if the observer is not permitted to state his impression or belief? Must a *fac simile* be attempted, so as to bring before the jury the very tone, look, gesture and manner, and let them collect therefrom the disposition of the speaker or agent?"

How does the case we are considering differ in principle from the case put by this learned judge. May it not be asked with propriety here, "Must a *fac simile* be attempted, so as to bring before the jury the very tone, look, gesture and manner" of Eastwood, in order to enable them to judge whether he was intoxicated or not? Would it be possible for the jury to judge with any certainty from any mere description which it would be in the power of the witness to give? I think it very clear that they would not. The question put to the witness Green was, therefore, in view of the principles and authorities to which I have referred, improperly overruled; and for this error, as well as on account of the irregularities of the jury, the prisoner is entitled to a new trial.

Judgment reversed and new trial ordered.