# COURT OF OYER AND TERMINER.

## THE PEOPLE agt. MARY HARTUNG.

On the examination of a bill of exceptions taken by the defendant upon a criminal trial, it is well settled that if a legal error, or an error in law, has been committed, it is the duty of a judge, on proper application, to allow a writ of error, and stay the execution of the judgment against the defendant.

And further, where on such examination the judge has grave *doubts* of the correctness of the rulings of the court at the trial, it is equally his duty, in the exercise of the judicial discretion with which he is clothed, to allow the writ and stay the execution of the judgment. For it is against the benign spirit of the common law to allow a conviction of crime to be had by its erroneous administration.

Applying these principles to this case, a writ of error was allowed, and execution of judgment stayed, on the ground that it appeared that improper evidence against the defendant had been admitted on the trial.

*At Chambers, April 23d,* 1859.

APPLICATION for allowance of writ of error and stay of execution.

W. J. HADLEY, *for prisoner.*
S. G. COURTNEY, *in opposition.*

WRIGHT, Justice. The prisoner was convicted of murder at a court of oyer and terminer, held in and for the county of Albany in February last. A bill of exceptions being settled and sealed on the 19th of April instant, application is now made to allow a writ of error and stay of execution, to enable the prisoner's counsel to take the judgment of the supreme court in respect to certain errors of law alleged to have occurred on the trial. Some three or four exceptions were taken, as disclosed by the bill, to the rulings of the court, in the admission of evidence, but none to the charge or instructions of the presiding judge. If there be any error, therefore, appearing by the record, to which exception was taken, it relates exclusively to the admission of evidence.

In determining the question whether a writ of error should be allowed, I have nothing to do with the facts disclosed on the trial, further than they point to the materiality or immateriality of evidence to which objection was taken. On the evidence given, the jury convicted the prisoner, and their verdict cannot be reversed. Upon the question of fact it is final. It is otherwise where the error is one of law. If improper evidence be received or permitted to go to the jury, or the court err in instructions as to the law applicable to the case, it is ground of review. It is against the benign spirit of the common law to allow a conviction of crime to be had by its erroneous administration. It will be conceded that, if, after a deliberate and conscientious examination of this case, as it appears by the bill of exceptions, I am impressed with the conviction that a legal error was committed, it would be my duty to allow the writ and stay the execution of the judgment of the oyer and terminer, until the question had been submitted to the scrutiny and adjudication of the higher tribunals. But I think the further proposition a sound one. If, after careful examination, and due deliberation given to the legal questions raised, I still entertain a doubt of the correctness of the rulings of the oyer and terminer, in the exercise of the judicial discretion with which I am clothed, I ought to allow the writ. I adopted and acted upon this rule in the case of *The People* agt. *Hendrickson* (some few years since), and I believe with the entire approval of the more eminent of the legal profession.

The first ground of error alleged is, in admitting proof of a conversation between the sheriff of Albany county and the prisoner, in the jail, some two months after her confinement, in which she admitted having written the letter which subsequently led to her pursuit and arrest. The objection was that the statement of the prisoner was not voluntary. The statement was made to the sheriff of the county, and while the prisoner was in custody. It was not, however, induced by any promise of favor. The officer did not encourage her to hope for any benefit or advantage to accrue from her admissions. What she stated was not extorted from her by the acts or dec-

larations of the sheriff, but seems to have been volunteered. It is quite probable that she was laboring, to some extent, under the influence of fear, from the inquiry put to the sheriff, "What do you think they will do with me?" but the answer of the officer could hardly have induced the indulgence of any hope of favor from the admission that she had written the letter. I think the statement voluntary. The prisoner having been arrested and in custody, charged with the crime of poisoning her husband, was doubtless laboring under extreme agitation of mind, and I am not sure that, had the statement been made upon a judicial examination, it ought not to have been excluded, within the principle of the case of *The People* agt. *McMahon* (15 *New-York R.* 384). It was said in that case, that the ground upon which statements or confessions are excluded, when made after arrest, is, that in the agitation of mind in which the party charged is supposed to be, he is liable to be influenced, by hope or fear, to state things which are not true. This principle was applied in the decision of *McMahon's* case, who was examined at a coroner's inquest, after having been arrested by a constable, without process, on the charge of drowning his wife. But a supposed mental agitation, induced by the emotions of hope or fear, has not heretofore been regarded as a ground of excluding statements or confessions not made in a judicial investigation, and when the party is not under the least coercion or called upon to speak.

Another ground is, that the court erred in permitting the letter, said to have been written by the prisoner, to be read in evidence, because there was not sufficient proof of her handwriting. This letter was written in the German language, and signed "Maria Theresa Koehler." It was directed to Ferdinand Schultz, and fell into the hands of a German by that name in Albany, who delivered it to the sheriff, which led to the prisoner's arrest in New-Jersey. It referred to the prisoner's connection with Rheinman, alluding cursorily to the death of Hartung, and, as the prosecution claimed, admitted guilty participation in effecting such death. The evidence undoubtedly bore strongly on the question of the prisoner's

connection with the act of producing Hartung's death. The only witness who identified the handwriting to be that of the prisoner was a German woman by the name of Streit. This witness testified that she had seen the prisoner write a letter, and sign two receipts. She sat at a table with her on one oc-casion when she wrote a letter, but she did not read it, nor did she examine the receipts. She thought the letter was in her handwriting, but would not be sure. She believed it was the same handwriting as she saw the prisoner write, and that was her only reason for thinking the one shown to be in the hand-writing of Mrs. Hartung. The letter was received in evidence and the prisoner excepted. I do not doubt that this was suf-ficient, accompanied by the other proof, in respect to the let-ters, which had been previously elicited, to fix the authorship and writing of it on the prisoner. Indeed, the testimony of Mrs. Streit was enough *prima facie* to identify the handwrit-ing. She showed herself competent to express an opinion. To authorize a witness to do this, it is enough that he has ac-quired a knowledge of the party's handwriting from seeing him write. It is unimportant as to the number of times he has seen the operation repeated, if he is able to affirm, from what he has seen, that he knows the party's handwriting. This is sufficient to authorize the expression of an opinion.

The third and remaining exception relates to a question put to the witness Porter, a professor of chemistry in the Albany medical college, calling for the expression of an opinion. A care-ful scrutiny of the case has led me seriously to doubt the cor-rectness of the ruling of the court on this point. At least, the prisoner is entitled to have the point deliberately examined. The theory of the prosecution was, that Hartung died of poison administered by his wife. The body was exhumed some months after death, and a post-mortem examination made. This examination was made by Dr. Jacob Rheinhart. The prosecution had placed Rheinhart upon the stand as an *expert ;* as a person of sufficient skill and scientific attainments to be able to form and express a correct opinion. He testified to the appearances he discovered upon the post-mortem exam-

ination; to the presence and extent of the inflammation, and to his opinion, that to produce inflammation to that extent, the irritating matter must have been taken into the stomach two months before death. He testified further, that the appearances which he observed (inflammation of the *œsophagus* and stomach) could not be produced by arsenic administered within three days of Hartung's death. The strongest circumstance connecting the prisoner with the act of poisoning was, the purchase by her of arsenic, less than three days before the death of her husband. The tendency of Rheinhart's testimony was, to relieve the prisoner from the weight of the inference to be drawn from the fact, that she had purchased arsenic only three days before the death of the deceased. It was, therefore, of vital importance to her. After Rheinhart had left the stand, Professor Porter was called by the prosecution. The trachea, stomach, liver, lungs and intestines of the deceased had been delivered to him by the coroner, with the view of ascertaining, by chemical tests, the presence or absence of poison. He testified that he examined with a view to ascertain whether there was arsenic, and whether it had been deposited in the remains before or after death; and that he detected arsenic in the stomach and liver; the greater portion in the stomach. He then expressed the opinion (although it nowhere appears in the case that his profession was other than a chemist), that the person died from the effects of the arsenic taken; and that, from finding a considerable quantity of arsenic, the person could not have lived long; it might have been one or several days. He proceeded to detail the symptoms of poisoning by arsenic, and the post-mortem appearance of death by poison. The counsel for the people then put to him the following question : " In your opinion, can a physician, from a mere post-mortem examination of the exterior surface, and the indications of inflammation which he discovers, determine, with any degree of certainty, the precise period of time when such inflammation was caused ?" The question was objected to as immaterial, improper and incompetent; but the objection was overruled by the court, and the question permitted. The ob-

ject of drawing out the opinion of the witness is, quite mani-
festly, to counteract any effect of Rheinhart's testimony.
Rheinhart had sworn, from his post-mortem examination, that
the irritating matter, which had caused the inflammation pro-
ducing death, must have been taken into the stomach two
months before death; and that the inflammation could not
have been produced by arsenic administered three days before
dissolution.   The chemist is asked whether, in his opinion,
from the indications of inflammation which a physician dis-
covers on a post-mortem examination of the exterior surface of
the stomach, and other organs affected, he can determine with
any degree of certainty the time when such inflammation was
caused ?  or, in other words, could Dr. Rheinhart, in the opin-
ion of the witness, determine, with any degree of certainty, at
what time the inflammation which he discovered was caused ?

I am not aware of any precedent for such a question, or any
principle which would permit it.   It virtually called for the
*opinion* of the witness, whether *another expert* could form an
opinion; and a chemist was allowed, in effect, to express his
opinion to the jury, that a physician was not competent to give
an opinion, in a matter relating peculiarly to his profession.
It seems to me, that Professor Porter was put in the place of
the jury to determine a question of fact, or, rather, to draw the
inference of incompetency in an expert, arising from a meagre
or imperfect examination of the subject matter of inquiry, by
the latter.   As a general rule, the opinions of witnesses are not
competent evidence.   To this, however, there are exceptions.
On questions of science and trade, persons of skill are permit-
ted to express opinions on matters pertaining to their particu-
lar science or art.   But I do not see that the question called
for an opinion on any matter of science.   It must be conceded
that the jury are as well able to decide whether a physician can
determine when inflammation commenced, from the facts being
stated upon which the witness forms his own opinion, as the
witness can.   If Professor Porter knew the extent of the
knowledge and skill of the medical profession generally, or of
Dr. Rheinhart as an individual, he might state the facts consti-

tuting the evidence of that knowledge and skill, and from these facts the jury could readily form a judgment, and make the necessary comparisons. Persons of skill are allowed to give their opinions in evidence only in cases where, from the nature of the subject, facts disconnected from such opinions could not be so presented to a jury as to enable them to pass upon the question with the requisite knowledge and judgment. If it was a material fact (as doubtless it was), when the inflammation which produced death commenced, from the testimony of Rheinhart and Porter, and the expression of their several opinions on the scientific aspect of the case, I think it belonged to the jury, exclusively, to pass upon and find the fact. So, also, it was for the jury to pass upon the question of the capacity of *experts ;* and it was scarcely allowable for one *expert* to judge, in the place of the jury, as to the competency of another.

Upon this latter ground, I am disposed to allow the writ. It may be that, upon further examination of the points, I shall become satisfied that the inquiry was a proper one. But I am not now without grave doubts of its propriety. Conscientiously entertaining them, I deem it my duty to afford the prisoner an opportunity to present the point, with others raised in the case, to the more deliberate examination and judgment of an appellate tribunal.