E. D. Smith, P. J.,
delivered the charge to the jury, in which, after instructing in reference to the crime charged, he proceeded as follows :
But, gentlemen, it is essential to the nature of the crime, that the party accused possesses a sound mind and memory at the time. He must be possessed of his senses, and of mind and intelligence sufficient to know the nature and quality of his acts. It is the essence of the definition of premeditated design, that the person must have sufficient mind to understand what he is doing. The act must be performed by a person capable of reasoning and understanding, and knowing the nature of the act. All men are presumed in the law, to have the full possession of their faculties, and. it is also presumed that in the commission of any act, every man in the ordinary exercise of such faculties, intends the legitimate consequences of his acts. It is, however, admissible for a defendant accused of crime, to show that he did not possess, and did not possess at the time, reasoning faculties essential to the commission of the crime. If he can satisfy the jury that he did not possess such faculties, they are to acquit him. The defendant seeks to be excused from this homicide, by attempting to establish the fact that he did not possess his faculties. The defense is, therefore, directed to satisfy you that the defendant was not of sound mind, capable of committing crime at the time he used that fatal axe. To that point, the evidence in the defense has been directed. If the proof of that fact is satisfactory to your minds, you must acquit him. The law does not require any sacrifice of a man who does not *215 act intelligently in the commission of the act for which he is tried. I have looked through several books containing trials for murder, and I took the precaution to see what judges have charged juries in such cáses. Juries are frequently instructed to acquit, if satisfied that the prisoner was incapable of knowing right from wrong, or, as the rule is sometimes expressed, if he was unconscious that the act was a crime against the laws of God and nature.
In McComb’s case, the learned judge used the language following: “If, in consequence of partial insanity, the prisoner was laboring under such a defect of reason as not to be conscious of the nature and consequences of the act, as not to know that the act was wrong, he should be acquitted.” That was the rule stated in that case. In Robinson’s case, the question was stated, “Whether, at the time, the prisoner was in a state of mind which enabled her to know that what she did was wrong ; if so, she was responsible.”
In Willis’ case (32 N. Y., 715; 5 Park., 621), which has been referred to here, it was stated that, “A person is not insane who knows right from wrong, and who knows the act he is committing is a violation of law, and is wrong in itself.” I have taken occasion to look at this case, which was reviewed by the general term in the third district. I thought I could not do better than to read from the opinion. Judge Ingalls says, “Two questions are presented for consideration : one arises from the charge of Justice Peckham, and the point excepted to is as follows: That a man is not insane, who knows right from wrong ; who knows the act he is committing is a violation of law, and wrong in itself.” In giving effect to that branch of the charge, it is proper to consider other portions which accompanied it. The learned justice charged the jury as follows: “A person is not insane, surely, that knows right from wrong, and. who knows the act he is committing is a *216 violation of law, and is wrong in itself. If he is conscious that the act is wrong, at the time he is committing it, that it is a violation of law—that it is a violation of the law of the land—he cannot be said to be insane. If, however, at the time he commits the act, he is under a delusion, he does not know right from wrong— he does not know that the act he commits is an offense, he does not know it was wrong, but is under a delusion in regard to it, why, surely, he is not responsible for his acts—he is an insane man.” I fail to discover wherein the charge in that respect, is not quite favorable enough to the prisoner. The test furnished by the charge, and by which the jury were to be governed in determining whether or not the prisoner was insane, was strictly in accordance with the law (People v. Pine, 2 Barb., 566). Justice Barculo, at page 572, says: “A simple and sound rule may'be thus expressed. A man is not responsible for an act, when by reason of involuntary insanity or delusion, he is at the time incapable of perceiving that the act is either wrong or unlawful.” In the same opinion reference is made to the rule which is laid down by Chief Justice Shaw, of Massachusetts, as follows: “A man is not to be excused from responsibility, if he has capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he is then doing ; a knowledge and consciousness that the act he is doing is wrong and criminal, will subject him to punishment” (Freeman v. People, 4 Den., 28). Beardsley, J., says : “ Where insanity is interposed as a defense to an indictment for an alleged crime, the inquiry is always brought down to the single question of a capacity to distinguish between right and wrong, when the act was done.” The mode of putting the question to the jury on these occasions, has generally been whether the accused, at the time of doing the act, knew the difference between right and wrong; which *217 mode, though rarely, if ever, leading to any mistake with the jury, is not deemed as accurate when put generally, and in the abstract, as when put with reference to the party’s knowledge of right or wrong in respect to the very act with which he is charged” (2 Greenl. Ev., 372). “ The rule of law is understood to be this, that a man is not to be excused from responsibility, if he has capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he is then doing (See, also, Dean’s Med. Jur., 549, 550, 551; Beck’s Med. Jur., 588). No error was committed in the charge ; it is fully sustained by the authorities cited ; and the exceptions thereto, not being well taken, must fail.”
This is an epitome of various cases which have been tried, and in which the rule has been stated as I have read; that case was taken to the court of appeals, and the rule was affirmed throughout, in the opinion of the court, written by Judge Denio.
There is now no room for doubt as to the rule of law in this State. “A man must have sufficient knowledge, reason, capacity, judgment and mental power to understand not merely that his act is a violation of law, but that it is intrinsically wrong.” Every human being endowed with reason, knows that to take the life of a human being is against the law of nature and of God. It is not sufficient that he knows the thing is an offense against human laws, but must have reason and capacity sufficient to know that he is not only violating the laws of man, but the laws of God and nature.
The defense in this case is directed to show you that the defendant did not have that capacity, and that he did not know, when he struck the blow, that he was committing wrong. If the proof of that fact is satisfactory to your minds, you must acquit him. The law does not require any sacrifice of a man who does not *218 act intelligently in the commission of the act for which he is tried. In applying this rule you will look at the facts of the case ; first in regard to the evidence to show unsoundness of mind. You will first consider what facts there are affecting the issue which are clear and undisputable. You find here the prisoner, a young man of about twenty years years of age. You find he was married about two years ago, and had one child. You find him married to a woman of dissolute life and vile character. You find that in infancy he was afflicted with fits and convulsions, that he had numerous fits of that character in his younger years. I think that you should assume that there was a taint of insanity in his family, though not in the direct line. The father had no symptoms of insanity, but his uncle and collateral relations of his father had the taint of insanity. This fact you are entitled to consider upon the question you are to decide. You find that this man, during the week previous to the homicide, had controversy with his wife. You find that they were reconciled on the Saturday before the homicide, so far that they went together to the house about eleven o’clock at night— so far you have facts which you may assume as undoubted.
Next you have the facts tending to prove the unsoundness of mind.
The fits which have been detailed ; those occurring in infancy, those up to ten or twelve years of age, and one or two after that. There is no controversy that he had epileptic fits, beginning in his infancy, and that they continued up so near as the Tuesday before the act was committed. If you believe the .testimony of the father and the woman living with him, you have proof that there was such a fit the week before the homicide. You have also exhibitions of wildness—those that relate to his seeing imps. The testimony of the father and the brother goes to prove that fact.
*219 You have also the testimony in reference to his striking against the wall at night. You have the further fact of his striking his father suddenly, and seeming unconscious of it, and without apparent object or motive. You have the further fact of his urging his father to say the Lord’s prayer, quick, quick. On Monday before the homicide you have the further fact that he came into the house saying that he was followed by the devil and six men. Another fact is, that he was attempting to raise a post which was beyond his strength, indicating , a delusion of mind. Another fact is, the statement that he was above Grod. Then you have the testimony of Bachs in reference to his conduct on Friday, when he was engaged by a lady to carry some trunks. These are the facts testified to directly, testimony of facts, tending to show that the defendant was laboring under some mental hallucination. These acts imply temporary aberration of mind at the time. The act of attempting to raise the post, and the other acts mentioned, are facts which you are to consider upon the question of the general unsoundness of mind of this man. It seems to me that you will hardly doubt that at the time he committed these acts he was laboring under some delusion, if you believe that the occurrences were as stated by the witnesses. They are not incompatible with the ordinary conduct of men which furnish the text or standard which you are to apply to his acts. These are the facts proved by the direct testimony, tending to show that he was laboring under a species of mental aberration. It is apparent that during the period of such fits he was unconscious. While he was in the fit he must be unconscious, as a general thing, of what was going on around him.
But fits are, as a general thing, temporary in their duration, I believe. And after the prisoner came out of the fit he was restored to a state of consciousness, in regard to what was transpiring, and able to take care, *220 of himself as before. In regard to these facts they are addressed to your common sense and your knowledge of men who have ordinary sense and intelligence.
The next testimony to which I direct your attention is the medical testimony. This is exceedingly important, and demands your careful attention. We are obliged to call upon physicians and surgeons to give us their testimony in regard to the facts in such cases. We are indebted to the physicians in this case in a large degree for the description of the case. We have had before us some of the most distinguished medical gentlemen of the State. There is in regard to the testimony of these physicians a distinction to be made ; you are to distinguish between the facts they testify to and their opinions. When a physician testifies in regard to a fact, you are to believe it just as you are to believe any other man of equal credit.
When they testify to a fact that they know from their study of disease, and their characteristics, and tell us what there is of the facts, you are to believe it. When they testify in regard to opinions, it becomes a different question. Some of these physicians testify to facts that we are bound to believe; they testify that the defendant had cerebral disease. I understand all the physicians to testify to that fact. They testify that he had had a high pulse, indicating some disease of the system, although they do not concur in the opinion that it is insanity; they testify in regard to his appearance, as to the blank expression of his face, and turgidness of his hands, and the disease of his ear. Everything that these physicians testify to as matters of observation, and by which they are able to tell you the characteristics of a disease, you are to believe as facts, as you would otherwise.
In considering their testimony, you will consider, in reference to each statement, whether it is a fact, or an opinion ; you will apply this rule to all the facts con *221 nected with the case, that are derived from the investigations of these physicians. They study their profession to acquire knowledge of disease, and its treatment. We have to trust ourselves to their hands, and we are bound to believe them, when they testify scientifically in respect to the human system, its laws, its condition, its symptoms of disease, and their characteristics. But this applies only to that class of facts which are within the range of their professional knowledge, and their testimony, in such cases, depends upon the oath of the witness, and his credit as a man.
We have the opinion of six or seven learned and distinguished physicians in regard to the state of the accused, and in reference of the characteristics of insanity. In looking at this testimony, the whole point of it is to show that the prisoner, at the time he committed the offense, was unconscious of the nature and quality of the act, and did not know the difference of right and wrong. The physicians all agree that the prisoner was an epileptic, and had been all his life ; but it matters not, that he had that disease, if these convulsions did not so affect his mind, that at the time of the commission of the offense he was unconscious that he was committing a crime. If his aberrations of mind were temporary, and his unconsciousness ended with the fit, then he would be responsible for his acts ; he would be responsible for all his acts which he knew to be wrong at the time he committed them. When he is apparently of sound mind and memory, we must hold him responsible for his acts, unless there is proof satisfactory, that there was at that time some defectiveness of reason that impaired his capacity. I think you will be satisfied that epilepsy was a disease that affected his brain. That is a fact all the physicians concur in ; and that his fits tended to impair his mind ; such, all the doctors tell us was the natural effect of the disease. You are bound to consider that the testimony establishes that *222 this epilepsy tends to impair his mental character. But it is no excuse that his mind was affected, if he retained sufficient mind, intelligence and capacity to know the nature and quality of his acts. He is responsible for his acts so far as he has capacity to know the nature of his acts and their quality, and to know that they are wrong.
The prisoner’s counsel claims that at the time the offense was committed, the evidence tends to show that he was laboring under an insane influence,—that he was insane to a degree,—that he did not know what he was about at the time of the commission of the offense. Another ground is claimed, that he had an insane paroxysm at the time.
The testimony of Dr. Gray,—his opinion is that his mind was enfeebled,—that he was practically of an insane mind at the time he committed this act. That is also the opinion of Dr. Moore. Their testimony does not make him commit the act upon an insane impulse, or upon a sudden paroxysm of rage or fury ; they say his mind was approaching dementia, and that he was, at the time of the commission of the act, practically insane. The doctors, it seems to me, are not sufficiently precise in the use of this term. We are obliged to apply to this case legal principles. Insanity is á kind of generic word, and includes various degrees of diseases of the mind. There are degrees of insanity, in some of which, there is no mind left. In other degrees, there are lucid intervals. There are persons who are afflicted with dementia, which, as I understand the testimony of the physicians, is a gradual impairment or enfeeblement of the mind. If that is what they mean, and such I understand to be the view of Drs. Gray and Moore, it is for you to say whether that degree of insanity had so far progressed with the defendant as to deprive him of the knowledge of the quality of his act. That the defendant was under a species of temporary *223 illusion of mind when he was committing some of the acts proven, is evident; but it was not continuous. The tendency of the opinions of Drs. Gray and Moore, seems to be that these fits had gradually impaired his mind, until they had reduced it to a state of dementia. If they mean to say that that is insanity in its unqualified sense, as applied to the prisoner, it is for you to say whether you believe it. We are not bound to believe the opinions of doctors, unless they are compatible with sound sense; doctors give many opinions which are merely speculative. They have their theories and speculations, and the difficulty with them many times, seems to be that they are hardly willing to admit that there is much in the human system, its ailments and diseases, that is beyond their knowledge and comprehension. You are not bound to believe the opinion of a doctor, unless it comports with your common sense, and is consistent with the facts in the case. We are greatly indebted to the medical profession, and cannot get along without them, and in doubtful cases, where there is intrinsic doubt in the case, their opinions are resorted to, and are proper helps to a jury in deciding doubtful and disputed questions that come within the range of their profession. It is an exception to all rules of evidence. The law deals in facts derived from the positive testimony of witnesses. We ask of all persons, but of medical men, what the facts are ; of the physicians we ask for facts and also for their opinions. The law requires that every man shall exercise all his faculties with integrity, or if he does not, he 'shall pay the penalty. He is only excusable when he is not conscious that he is violating the laws of God and man. This degree of unconsciousness is the only insanity that the law will allow as an excuse for the commission of an act otherwise criminal. If you believe that the prisoner was, at the time he committed the act, unconscious of , *224 what he was doing, if he did not know that what he was doing was wrong, he was insane.
You have the opinions of Drs. Gray, Cooke and Moore, on the side of the prisoner, who are among the most celebrated physicians in the country. Their testimony in regard to the facts you must believe. Their opinions you must consider in the light of the rules I have given you.
You have on the other hand the testimony of other distinguished men, who differ with them in opinion, and who think that this man was not insane at the time he committed this act. You see, therefore, that the question is one where you must decide where the doctors differ. It is a case where some think the man is insane and some think he is not. It is for you to say which class of opinions best comports with the facts of the case, as revealed in the evidence. There are some surroundings of this matter which it seems hardly necessary for me to refer to. There has been a commission in his case and a report made. That commission was made under the sanction of the court. The persons who signed it were called upon and have testified, with the exception of Dr. Dean. The questions involved were of such a nature that it was necessary that they should be deliberately presented and passed upon by a jury. The court did not deem it proper to act upon that report. It has been read in your hearing, and the gentlemen who signed it have verified the report. It tends to show that the prisoner was bordering upon a state of dementia at the time of the examination of the commission. The case has been very fully discussed by the counsel for each side, and I cannot doubt that you are familiar with the evidence which has been given. You are called upon to decide what was the true condition and state of the prisoner at the time he committed this deed. The people are bound to satisfy you that this man committed the *225 crime of murder, that he possessed at the time a mind capable of the commission of crime. The prisoner has given evidence to show that he did not possess a sound mind at the time of committing the offense ; that is the point of all the testimony, to show whether this man was conscious, at the time he killed this woman, that he was committing a crime, or that the killing of his wife was wrong. If he knew it was wrong, he cannot be excused ; but if you are satisfied that his mind was unsound, that he committed this offense under an insane impulse; if he raised that axe and struck her with it in an insane moment, unconscious that he was doing wrong, he should be acquitted, and it is your duty to acquit him. The law does not seek to punish a man who does not deliberately and knowingly commit a crime. That is the whole of the case as it comes before you; you are to consider all this testimony in connection with the points and rules of law as I have stated..
This prisoner is responsible for his acts as a rational human being. If he knew he was doing wrong, if he-deliberately resolved to put an end to his wife’s life; and did it intending to kill her, while of sound mind, and conscious of the difference between right and wrong, he is guilty of the crime of murder. If he did it in a paroxysm of fury, it was an act of insanity. If the testimony satisfies you of that fact, it is your duty to acquit.
This man is on trial for his life. It is a weighty responsibility you are called to discharge on the whole issue ; the prisoner is entitled to the benefit of every rational doubt: that means that in looking over the- facts-, the benefit of every rational doubt belongs to the prisoner. You are to look through the facts and see what they are, and if there is an essential rational doubt—not a doubt conjured up to find an excuse to acquit—give him the benefit of it. The prisoner is in your hands, he is an unfortunate man. We -commiserate, and all *226 sensible men must commiserate his condition. He was led into a really unfortunate marriage. All the elements connected with it were calculated to bring unhappiness and distress to any man. It is not surprising that he should have been distressed beyond measure, when he found himself connected for life with a vile, dissolute woman. It is not surprising that it should have worked upon his mind and distressed him, or that he should act rashly under' that distress ; but he had no right to kill his wife intelligently. He had no right to deliberately kill her. She may have beguiled him into a marriage, but that does not justify him in taking her life. That he was tempted to do wrong, is no excuse for the wrong, no excuse for murder.
' If he had the moral sense and the intelligent mind to distinguish the nature and quality of his acts, and to know that it was wrong, his acts and his crime is murder. Tour attention has been called to numerous cases where the defense of insanity has been interposed. The defense of insanity is a lawful and proper defense. It is the duty of the jury to consider it without prejudice, and all the evidence presented in its support on the trial. They are to meet it honestly and fairly, and decide upon it honestly and fairly, according to the evidence and its weight. You should not start with the assumption that the defense is wrong or inadmissible. You should consider it, and try it upon its merits. It is undoubtedly true that this defense is improperly interposed in some cases ; it is undoubtedly true that the public sense has been shocked at' some defenses of insanity which have prevailed, and in some instances of acquittal from insanity, where the accused was found sane up to the moment of the act, and insane at the moment, and sane immediately afterwards.
The jury should find a verdict intelligently, as the evidence impresses their minds. If the jury find the .defense is unwarrantable, they are to say so by their *227 verdict. If they find it fairly made out, they are to say so. They should do justice according as it appears to them upon the whole evidence in the case, without regard to any other consideration. The law must take its course without regard to outside considerations or influences.
This unfortunate man is now in your hands—you are to go to your room and consider with care what is the truth, whether the crime of murder in the first degree is .made out. The defense have said that the prisoner is not an accountable being in the eye of the law, by reason of insanity. You have heard the testimony and the arguments, and you are now to decide what is the truth. If you find when he raised the axe and struck the fatal blow, that he was conscious of what he was doing, and did it deliberately, it is your duty to convict him ; and if you have doubts upon that subject, and think that the prisoner was not a sane man at the time, you should give to the prisoner the benefit of that doubt, and acquit him.
Do your duty, and find a verdict according as the evidence impresses your minds, such as will satisfy your own conscientious convictions.
Mr. Martindale, counsel for the defendant, excepted to the charge instructing the jury that there was no necessity of considering any other malice in the case, than that implied in a premeditated design to kill.
The counsel for the prisoner requested the court to instruct the jury, if they found that the prisoner had been affected by habitual derangement during the preceding week, that it is for the prosecution to adduce satisfactory proof that the act in question was committed at a time when Montgomery had a lucid interval, and was restored to the use of his reason.
The judge said that he understood the rule of law to be, and so charged, that when the proof shows a *228 case of fixed or confirmed insanity, then the people were bound to prove that the criminal act was committed in a lucid interval, or after the prisoner was restored to a sound mind.
The counsel for the prisoner then requested the court to charge as follows: “The habitual'insanity having been proved, it devolves on the prosecution to prove more than that the prisoner had been restored to a cooler moment, an abatement of pain or violence, or of a-higher state of torture, a mind relieved from excessive pressure. The prosecution must affirmatively prove that the act was committed in an interval, in which the mind, having thrown off the disease, had recovered its general habit.”
The judge said in substance, this would be right, if confirmed and continuous insanity had been proved, which I think is not claimed or proved, and he could not vary the charge as made in respect to the rule of evidence, and declined to charge, or modify the charge, otherwise than as he had above stated. To which refusal the counsel for the prisoner duly excepted.
The counsel for the prisoner requested the court to charge, if the jury should find, as matter of fact, that the prisoner accurately described his state of mind to the witness, Codding, and that at the moment of the commission of the homicide, he stood five minutes, or any other brief period of time, with the axe in his hand, trying not to commit the act, and then seemed impelled to strike her, and though he did not want to, had to strike her; if they found that to be the true state of his mind, he was irresponsible.
The judge said in substance, that was a matter of fact for the jury, and not of law, and declined so to charge, to which refusal the counsel for the prisoner duly excepted.
The counsel for the prisoner requested the'court to instruct the jury, that the opinions of Drs. Whitbeck *229 and Montgomery, if not appearing that they had had any practical, professional experience in the disease of insanity, were not to be considered by the jury, and have weight as the opinions of professional experts.
The court refused so to charge, to which refusal the counsel for the defendant duly excepted.
And the jury having deliberated, rendered their verdict of guilty.
After the trial, the cause came before the oyer and terminer, on motion for a new trial; and, subsequently, before the supreme court, on certiorari.
I. Motion for new trial.
Shortly after the trial the prisoner applied to the court of oyer and terminer, for a new trial. The allegations on which the application was based, appear fully in the following opinion.
J. H. Martindale, for the prisoner.
J. M. Davy, district-attorney, for the people.
By the Court.* E. D. Smith, P. J. The notice of motion in this case included an application for a new trial upon the questions of law raised upon the trial, and upon the ground that the verdict was against the weight of evidence, and also upon the ground of various irregularities in the conduct of the jury and-otherwise specified in the notice.
We held at the opening of the argument, that the court had no power to grant a new trial upon the merits, and declined to entertain the motion, except upon the ground of irregularity, surprise and newly discovered evidence. The irregularities specified I will con- *230 aider in the order in which they are presented in the argument.
First. That the jury separated during the trial.
The facts upon which this allegation of irregularity is based are in substance as follows:
The jury, it appears from the affidavits read on the motion, were impanneled and sworn on May 17, and were then put under the charge of two constables, sworn and instructed to keep them together during the trial, as is usual in such cases. On the ensuing morning, the 18th, the jury started from the National Hotel, where they were kept, to take a walk, and did take a walk to and along Union-street, in said city, some half a mile from their hotel; after they had proceeded a distance up Exchange-street, as far as the swing bridge on said street, one of their number separated from the rest, and returned to the said hotel, where he remained till the others returned in about half an hour. One evening during the same week, the same juror was seen to separate on Buffalo-street from the rest, and cross the street to where a crowd was assembled attending an auction, at the corner of Buffalo and Exchange-streets, at about eight o’clock in the evening ; the said juror mingled apparently with the crowd, and the affiant saw him pass up Exchange-street and back; when he so passed up Exchange-street and returned, the affiant saw but a single person with him. The said juror, Rockwell, was seen on the ensuing Monday, May 22, on the steps of Congress Hall, near the railroad depot, where he was spoken to by a man by the name of Newton, an officer of the internal revenue, and asked if he had made a certain return, to which he replied, No, that he was on a jury ; and, upon being asked what jury, said, “ the jury in the murder trial.”
It appears from the affidavit of Hiram Rogers, one of the constables having charge of said jury, that on the three occasions above stated, when the juror Rock *231 well, was separated from the rest of the jurors, that he, the said constable, was with him, that he had him under his charge ; that said Rockwell did not stop or mingle with the crowd on the corner of Buffalo and Exchange- streets, as stated, but passed by the corner of Exchange-street; that he, the said Rockwell, had no conversation with any person on these occasions, except the conversation above stated with Newton, who made the inquiry in regard to a certain return as above stated, and the said Newton who made such inquiry also verified, this statement of the constable in respect to this conversation.
From these facts it clearly appears that no separation of the jury in fact took place, or is established, which was improper or not allowable. The separation of a jury, which is disallowed, and which will constitute misbehavior on the part of the jury, is when some of the jury separate from the rest and go out of the reach, sight and control of the officer having the jury in charge. Such was the fact in Eastwood’s case (3 Park. Cr., 25), to which we were referred on the argument. In that case some of the jurors separated from the rest and went and viewed the place of the homicide, and also some of the jurors separated from the rest and held conversations with other persons, not in the presence or hearing of either of the constables in charge of the jury. Such separation, it was considered in the opinion of the learned judge, delivered in that case, would be fatal to a verdict against the prisoner, unless it was shown affirmatively on the part of the prosecution, by the clearest evidence, and beyond a reasonable doubt, that no injury to the prisoner could have occurred in consequence of such separation. This opinion was based chiefly upon cases in other States, and was in conflict, in this particular, with several cases in our own court, viz: the cases of People v. Douglas, 4 Cow., 36; People v. Douglas and People v. Ransom, 7 *232 Wend., 422. The discussion of the question of the separation of the jury was, however, able and elaborate, as is usually the case with the opinions of the learned judge delivering it; but I think the new trial in that case can hardly be considered as granted upon, that ground. The motion was denied at the oyer and terminer, and there was a valid exception in the case, which warranted the new trial granted at the general term, and upon which it was expressly put in the court of appeals (Vide 14 N. Y., 562).
The recent case of Willis v. People, 32 N. Y., 722, also shows that the court at the general term had no power to grant a new trial in such case, except upon the matter appearing on the record, and could not review the decision of the court of oyer and terminer on the motion for a new trial.
But at the time when that case was decided it was in this State, I think, the uniform practice in capital cases, and was generally considered necessary by the courts, to keep the jury together from the time they were impanneled during the progress of the trial, as much so as after the case was finally submitted to them for their decision. But the rule is now otherwise, and has been so regarded and held, I think, since the decision of the case of People v. Stevens, 4 Park. Cr., 316. In that case the trial took place in the oyer and terminer in New York city, and occupied about three weeks, and the jury were permitted to separate and go to their homes nights during the progress of the trial, as in civil cases. Upon the application for a new trial in the general term in that city, the question was very elaborately discussed, and in an able opinon of Judge Lott, it was held that it was not error to permit such separation during the progress of the trial, and that the question was properly and entirely within the discretion of the court of oyer and terminer. It is true, that in that case the prisoner consented to the separation of the *233 jury, but the court held that such consent was unnecessary, and that the prisoner in such cases ought not to be asked to give such consent, which I think the true and sound view on that question. This case went to the court of appeals where the whole question was again very elaborately discussed in an opinion by S. B. Strong, J., in which he concurred in the opinion of Lott, J., at the general term. The judgment was affirmed, and remains unreversed ; three judges, Comstock, Allen and Grover, JJ., expressly agreeing with Strong, J., that such separation was permissible in the discretion of the court of oyer and terminer. Two dissented on this question,— Selden and Gray, JJ. ; Johnson and Denio, JJ., expressing no opinion on this point, but, all agreed that it was not error in that case, the prisoner having consented to the separation. Since this decision, I think it has pretty generally been considered in this State that the question was one within the discretion of the court of oyer and terminer.
In this case the jury were kept together under the usual instructions in such cases. I considered that it was not discreet and proper to do so, as the subject of the homicide and the nature of the defense had been discussed in this city where the case arose, and the people at large were quite familiar with the facts ; but in many capital cases the keeping of a jury together during a long trial is, I think, entirely unnecessary, and imposes upon the public a heavy burden of expense, and upon jurors a great hardship. And I have no doubt that within the provision of the Revised Statutes (vol. 2, 735, § 14), as follows : “ The proceedings prescribed by law in civil cases in regard to the impanneling of juries, the keeping them together and the manner of rendering their verdict, shall be had upon that of indictments,” the question of the separation of the jury during the trial, is entirely within the discretion of the court of oyer and terminer, as in civil cases *234 at the circuit. There was, therefore, clearly no irregularity in the separation of the jury in this case, in any aspect of the case, as shown in the affidavits produced.
Second. The next specification of irregularity urged upon our attention, was that the jury visited the premises where the homicide occurred, in the absence of the prisoner and his counsel.
The ground upon which this charge of irregularity is based, is the fact stated in several affidavits, showing that eleven of the jurors, on the morning of May 18, when they started for a walk, and at the time when the juror Rockwell separated from them at the swing bridge on Exchange-street, as before stated, went thence to and up Union-street, and passed the place of the homicide at the corner of Monroe and Union-streets, in said city.
The constable who attended the jurors upon this walk, clearly shows that nothing improper or censurable was done by these jurors on that occasion. He states in substance, in his affidavit, that these jurors went to Washington-square, in said city, viewed and inspected the arsenal situated thereon, and there some one suggested that they go up Monroe-street, leading eastward from said square, and that they did accordingly pass up said street to Alexander-street, some distance eastwardly, beyond the junction of Union with Monroe-streets, and that in passing the corner of Union and Monroe- streets going and returning, neither of the said jurors entered the building where the said homicide was committed, nor was there anything said by either of the said jurors about viewing or inspecting it; and also that while said jurymen were passing said building their attention was not called to the fact of its being the place where the homicide was committed, and there was no conversation whatever among the said jurymen in regard to it, and that said jurymen did not even stop upon the sidewalk adjacent to said *235 building to look at the same in going or returning, and the said constable also states upon his opinion and belief that very few if any of the said jurymen at the time they passed said building and returned, knew of its being the place where the homicide was committed.
This entirely disproves the allegation that the jury were guilty of any misbehavior in viewing or inspecting the place of the homicide ; and if they had stopped upon the sidewalk adjacent to said building, and casually viewed the said premises and looked at their general location, without going into the chamber of the said building, where the homicide was committed, and inspecting the same, I cannot think it would have been misbehavior on their part, or any more objectionable than it would have been to have taken a juror from that ward of the city or locality to serve on the panel. The theory of jury trial is, and its excellence chiefly consists in the fact that the jury are taken from the vicinage, and for the reason that they know the parties and are familiar with the locality where the case arose ; and no court would listen to a challenge to a juror that he was well acquainted with the place and with the description of the premises where the crime had been committed. Clearly, there was no irregularity or misconduct on the part of the jury in this particular.
Third. The next allegation of irregularity is, “ That a medical witness, Dr. Hammond, was produced and gave testimony in the case on the part of the people, by the procurement of the district-attorney, under a contract that such witness, not being a poor: witness, nor being a non-resident of the State, should be paid a consideration of five hundred dollars for attending the court and giving his testimony, and was paid that sum of money, and this without the knowledge of the prisoner or his counsel until after his testimony in the case was closed.” Upon this statement of facts, I cannot perceive upon what ground or principle *236 an allegation of irregularity can be based or sustained ; but it is doubtless due to the importance of the case, the character of the question involved, and to the consideration of what is due to the proper administration of justice in respect to public prosecutions, that the facts contained in the affidavits produced should be more fully stated and considered. From the stenographer’s notes and our own minutes of the trial, we know that the fact and body of the crime for which the prisoner was tried, was very clearly proved, and was really undoubted and unquestioned, and that the only defense set up and sought to be established at the trial was that of insanity. It appears from the affidavits read on this motion that the case was put over the last February term of this court, upon the allegation that the defendant was insane, and a commission of distinguished physicians was fixed and agreed upon by the attorney-general and the counsel for the prisoner, and assented to, and appointed by the court, so far as it had the power to do so, to ascertain by inspection and otherwise, and report- whether the prisoner was or was not insane ; and it also appears and was well known that the case also went over the April term to allow an inquiry to be instituted, and that such inquiry had been instituted by the county judge, with a jury under the statute of 1842, to ascertain whether the prisoner was or was not insane, upon which inquisition the jury were unable to agree.
The case, therefore, was necessarily prepared for and came on for trial at the present adjourned term of the oyer and terminer.
The prisoner, to prove and establish his defense of insanity, called a number of distinguished physicians, and the people also called several physicians upon that issue, and among others, Dr. Hammond. In respect to the attendance of Dr. Hammond, particularly as a witness, the facts stated in the affidavits are in substance *237 as follows: The affidavit of the counsel for the prisoner states that preparatory to such court he was induced to write to Dr. Hammond, of the city of New York, and. sent a gentleman to see him a few days before the court, to inquire (not as to his opinion), but whether he would come and examine and testify in the case ; that he received information in reply that he was coming at the request of the district-attorney and would be present; that the trial began on Wednesday, May 17, and on the following morning Dr. Hammond arrived in the court house, as the counsel was opening the case for the defense; that he saw Dr. Hammond at noon of that day, and was informed by Mm that he wished to examine the prisoner, and would make an impartial examination ; and he also saw Dr. Hammond the same evening, and had considerable conversation with him about the case and the condition of the prisoner ; that before the prisoner closed his case he called Dr. Hammond as a witness for the prisoner, and examined him at some length, and that the people recalled him in reply, when he was further examined : that on Tuesday, May 33, while the counsel for the prosecution was summing up the case for the people, he received information that the district-attorney had contracted to pay Dr. Hammond five hundred dollars for coming to Rochester and testifying in behalf of the people ; that during the recess at noon he inquired into the facts, and found that a warrant for the treasurer had been drawn in Dr. Hammond’s favor, and paid for five hundred dollars ; that Dr. Hammond was then a resident of the city of New York and that his reasonable expenses could not exceed fifty dollars ; and that on the coming in of the court after the recess he called the attention of the court to the fact in the presence of the jury, and that such payment had been made as above stated with the sanction of the court, which was admitted by the district-attorney, and not denied.
*238 The affidavit of the district-attorney on the same subject states that preparatory to said trial, he took all the testimony which had been taken before the county judge as above stated, and went to the city of New York, and laid the same and the whole case before Dr. Hammond, and asked him for his opinion upon it, and learning from Dr. Hammond that he could not give him a satisfactory opinion without seeing and examining the prisoner, he inquired of him upon what terms he could be induced to come to Rochester and make such examination and attend the trial as a witness; and learning that he could not be induced to come for anything less than five hundred dollars, he left him and consulted the district-attorney of the city of New York, and the United States district-attorney of the southern district of this State (Judge Davis), on the subject of the propriety of engaging Dr. Hammond to come to Rochester and attend the trial at the price aforesaid, and was advised by both of said officers that it was customary for district-attorneys to employ and pay experts in professional life, like Dr. Hammond, and that his charge was reasonable in view of his high reputation and extensive practice in his profession; that deponent then returned home and consulted the judges of the court of sessions and several members of the board of supervisors of Monroe county, and also two of the justices of the supreme court of this district, on the subject, all of whom advised him that they thought that, as the public prosecutor for the county, he would be justified in making the proposed arrangement to secure the attendance of Dr. Hammond at this court, and advised him to make such arrangement.
The district-attorney further states in his affidavit, that on Monday before the trial he informed the counsel for the prisoner that Dr. Hammond would be present at the trial as a witness for the people, and that *239 after his arrival Gen. Martindale had frequent interviews and consultations with Dr. Hammond during the progress of the trial, and took the doctor to his house to spend an evening; and that after such interviews, intercourse and consultations, the said counsel called Dr. Hammond as a witness for the prisoner, and improved him as such ; and that he is informed and believes that it is customary throughout the State for the courts to pay professional witnesses for their time, expenses and services, as in this case, upon the application of the district-attorney of the county; and that deponent had no other object in calling Dr. Hammond except to elicit the truth before the jury.
Upon these facts we do not see that the calling of Dr. Hammond as a witness, and the payment to him of a sufficient sum to secure his attendance at' the court, during the trial, was in any respect an irregularity or did any wrong to the prisoner. It seems to us that the district-attorney was acting in the line of his duty as public prosecutor in securing the attendance of a proper medical witness of high, repute, to meet the distinguished medical experts which he knew the prisoner expected to call on his side. The question at issue on the trial was chiefly a medical one, in respect to which the opinions Of medical men would be likely to exert a great if not controlling influence. The witnesses who had testified before the county judge, and those also who had acted on the commission, were among the most distinguished members of their profession upon the particular questions involved on the trial. Those witnesses the prisoner was expected to call on the trial; and the district-attorney would, it seems to us, under the circumstances of the case, have been derelict in his duty do the people of this county, if he had not taken the requisite steps to secure the attendance of witnesses of equal distinction and consideration in their profession, oh the part of the people.
*240 The district-attorney, it is true, might have required the attendance of Dr. Hammond on subpoena ; but that would not have sufficed to qualify him to testify as an expert, with clearness and certainty, upon the question involved. He would have met the requirement of a subpoena if he had appeared in court when he was required to testify, and given proper impromptu answers to such questions as might then have been put to him in behalf of the people. He could not have been required, under process of subpoena, to examine the case and to have used his skill and knowledge to enable him to give an opinion upon any points of the case, nor to have attended during the whole trial and attentively considered and carefully heard all the testimony given on both sides, in order to qualify him to give a deliberate opinion upon such testimony as an expert in respect to the question of the sanity of the prisoner. Professional witnesses, I suppose, are more agreed to be paid in.such cases, cannot affect the regularity of a trial. It may, perhaps, properly affect the question of their credit with the jury. In this case, it appears that the facts in respect to the employment or payment of Dr. Hammond were fully and publicly stated in the presence of the jury before the case was given to them, and may have and must have had such influence with them as they thought proper to give to them, under the circumstances of this case. We do not, therefore, think they present any ground for a new trial, as a question of irregularity, or otherwise.
The prisoner’s counsel also asks for a new trial, on the ground of surprise, in respect to the testimony of Dr. Hammond, and of newly discovered evidence.
So far as relates to the question of newly discovered evidence, the application is based upon several affida *241 vits showing that the prisoner has had a fit in the jail since his trial, and it is claimed that this fact tends to show that he did not simulate, on the trial and before, the appearance of an insane person.
On this question the allegation is in substance that the testimony of Dr. Hammond tended to show that the prisoner’s appearance of indifference and apparent unconsciousness on the trial was assumed or feigned, and that the proof of the fit had at the jail since the trial tends to refute such evidence. This is not new evidence in kind or degree, and is really nothing but cumulative testimony on the main issue. Much testimony was given on the trial proving that the prisoner was accustomed to have fits, had numerous fits in hi® infancy and in his earlier years, and a few later in life, and one in the week previous to the homicide; and this evidence was not questioned or doubted. Proof of another fit occurring after the trial could not affect the question, particularly on another trial. It is not newly discovered evidence within the rule, applicable to such cases, that the newly discovered evidence, to warrant a new trial, must be material, and to go to the merits, and not be cumulative, collateral or corroborative, and such as ought to produce on another trial an opposite result on the merits (Vide Am. Crim. L., §§ 3, 161). Such we think quite clearly would not be the effect of making proof of this fit at the jail, just as it is presented in the several affidavits read and produced on this motion.
On the point of surprise, the facts above stated and contained in the affidavits of counsel for the prisoner, and of the district-attorney, we think do not show that the prisoner’s counsel had any just ground of complaint or of surprise, in a legal sense, in respect to the testimony of Dr. Hammond. The counsel for the prisoner states that he advised his client to submit to examination by Dr. Hammond, and that he did submit *242 to such examination, and that Dr. Hammond did not fully disclose to him the whole of such examination. The defense of insanity set up for the prisoner necessarily subjected him to the test of medical examination. I do not see how Dr. Hammond, seeking to make an examination of his person to ascertain the state of his system, his health, and the symptoms of mental disease, as a witness and expert called in behalf of the people, could properly be denied such an opportunity. To have refused to allow it would have been a virtual admission that such defense was unfounded, and the appearance of the prisoner in his person and conduct, giving color to such defense, and relied upon in part to sustain it, were simulated for the purpose of such defense. The counsel for the prisoner had constant intercourse with Dr. Hammond during the trial, and finally virtually took him away from the prosecution and appropriated him as a witness for the prisoner, by calling him as such witness and examining him as far as he pleased. Dr. Hammond, so far as we could see, answered all the questions put to him by the counsel on such examination with frankness and explicitness, and we cannot see that it furnishes any ground for the complaint of surprise that he gave further and fuller testimony afterwards when called by the prosecution.
The fact stated in the affidavit of the counsel that when he so called him as a witness he was ignorant that he had made a contract with the district-attorney to appear and testify as a witness on the part of the prosecution, for the sum of five hundred dollars, cannot, that we see, affect the question of surprise. Certainly the learned counsel knew that Dr Hammond came to Rochester to examine the prisoner and attend the trial as a witness in behalf of the people, and upon the employment of the district-attorney. It could hardly have been supposed that he came volun *243 tarily and spent so much of his time without some compensation, and such compensation to be paid necessarily from the funds of the county at the instance and upon the application of the district-attorney.
Within the rule applicable to cases of surprise in respect to the proceedings of a trial, we do not see any basis of fact upon which the court would be justified in granting a new trial on this specific ground. We cannot see that the prisoner’s case was affected injuriously by any essential surprise in law or fact, or by any accidental or unforeseen occurrence during the trial to his prejudice. And, upon the whole case, we think the motion for a new trial should, therefore, be denied.
Motion denied.
II. Certiorari. E. D. Smith,J., subsequently allowed a writ of certiorari, in obedience to which the proceedings on the trial were certified to the supreme court.
J. H. Martindale, for the defendant.
J. M. Davy, for the people.
By the Court. Mullin, P. J. [After stating the facts as in the beginning of this report.]—I have given this very brief synopsis of the evidence to show that the evidence was conflicting, and that it presented a case which it was peculiarly within the province of the jury to decide. Unless, therefore, some rule of law has been violated, the verdict must stand, even if we should be of the opinion that upon the evidence we should have arrived at a conclusion different from that at which the jury has arrived.
Several of the witnesses who testify as to the appearance and conduct of the prisoner during the week preceding the homicide, were his relations, and it is not doing them any injustice to say, that the' jury would be justified in making some allowance for the *244 bias under which they would naturally testify, whether they were called by the people or the prisoner. It may be conceded for the purposes of the case that the weight of evidence is, that the prisoner was, at the time of the killing, insane; but we cannot for that reason set aside the verdict, unless the preponderance is so great against it as to justify the inference that it was the result of passion or prejudice. Ho such inference can be fairly drawn from the evidence given on the trial. The case made was one in which the verdict might properly be rendered ; and being rendered, the court cannot, and ought not, to set it aside.
This brings us to the inquiry whether any error was committed by the court on the trial, or in the charge to or refusal to charge the jury.
The first exception of the prisoner’s counsel is to the charge of the court;—that, when the proof shows a case of fixed or of confirmed insanity, the people were bound to prove that the criminal act was committed in a lucid interval, or after the prisoner was restored to his right mind.
This instruction was not excepted to by the prisoner’s counsel, and the question whether it was a proper instruction is not before us.
Instead of excepting, the counsel requested the court to charge that habitual insanity having been proved, it devolves on the prosecution to prove more than that the prisoner has been restored to a cooler moment, an abatement of pain or violence, or of a higher state of torture, to a mind relieved from excessive pressure. The prosecution must affirmatively prove that the act was committed in an interval in which the mind, having thrown off the disease, had recovered its general habit.
The judge refused to vary his charge, and the defendant’s counsel excepted.
The standard that the request asked the court to *245 adopt, by which to determine whether the prisoner was responsible for homicide, is, whether his mind, at the time of the commission of the crime, had thrown off the disease under which it had been suffering, and had recovered its general habit. By the general habit I suppose is meant its normal sound condition.
Whatever may be the rule on this subject in England or in the other States of the Union, this is not the test, in this State, by which responsibility for crime is determined.
If, when insanity is shown, it is incumbent on the prosecution to show that it has altogether ceased to exist, that the mind has thrown off the disease and is restored to a healthy condition, the conviction of an offender would be practically impossible.
The evidence of the physicians in this case shows that a man may appear to be sane, he may talk and act like a sane man, and yet be in fact insane; and after a lapse of time become really sane, and be entirely forgetful of all that transpired during‘the period when he was supposed to be of unsound mind.
If perfect soundness of mind must be established, in order to make a person liable for crime, we may as well confess at once that it is impossible to say, with certainty, that any man who commits crime is sane, and, therefore, responsible for his acts.
God alone can determine when and to what extent man is responsible for violation of either human or divine laws. Laws must be passed, prohibiting and punishing crime. The courts that are required to administer such laws know that crimes are not unfrequently committed by persons who are not mentally capable of distinguishing between what is right and what is wrong, and that such persons, both by the laws of God and man, should not be held responsible for their acts, while in that condition.
In applying this standard of responsibility, they *246 bring to this case all the learning and experience they possess. They must not decline or even hesitate to decide because they may find guilty, and punish, those who are innocent; but having done all that lies in their power to arrive at the truth, they must punish or acquit, as in view of all the considerations that are presented to their minds, they shall deem to be right.
They may be mistaken, but honesty of purpose and of effort to arrive at the truth must furnish the excuse for the error, if one is committed.
A man may be insane, and yet be capable of distinguishing between right and wrong. It is only when the insanity has taken possession of the whole mind, so as to obliterate altogether the capacity to make this distinction, that he becomes responsible.
In People v. Freeman (4 Den., 9), it was held that when insanity is relied on as a defense for crime, the question for the jury is, whether, at the time of committing the act, the accused was laboring under 'such mental disease as not to know the nature and quality of the act he was doing, or that it was wrong. In Willis v. People (32 N. Y., 715), it was held that the-proper instruction to the jury in a case of 'homicide when insanity was relied on as a defense, was, that if the prisoner, when he killed the deceased, was in such a state of mind as to know that the deed was unlawful and morally wrong, he was responsible ; and that otherwise he was not. In this case the decision of the supreme court in the case of Freeman was approved.
Lord Mansfield, in the case of Bellamy, laid down the rule by which the question of responsibility or irresponsibility of the accused was to be determined, as follows : In order to support the defense of insanity, it ought to be proved, by the most distinct and unquestionable evidence, that the prisoner was incapable of judging between right and wrong; that, in fact, it must be proved beyond all doubt that at the *247 time he committed the act he did not consider that murder was a crime against the laws of God and nature. Lord Lyndhurst, in Rex v. Offord, inquired, “Did the prisoner know that, in doing the act, he offended against the laws of God and of man ?”
By the Scotch law the insanity must be of such a kind as entirely to deprive the prisoner of the use of reason, as applied to the act in question, and the knowledge that he was doing wrong in committing it. If, though somewhat deranged, he is able to distinguish right from wrong, in his own case, and to know that he was doing wrong in the act which he committed, he is liable to the full punishment of his criminal act. In the case of Abner Rogers, Chief Justice Shaw laid down the rule, as follows : A man is not to be excused from responsibility, if he has capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he is then doing. A knowledge and consciousness that the act he is doing is wrong and criminal, will subject him to punishment; although he may be laboring under partial insanity, if he still understood the nature and character of his act and its consequences, if he has a knowledge that it is wrong and criminal, and mental power to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment, such partial insanity is not sufficient to exempt from responsibility for criminal acts.
The English courts hold that it is no defense for a crime that the prisoner supposes he is redressing an injury or grievance. In Massachusetts the rule is, that, if the imaginary facts would, if true, justify the act, then he is excusable,—as when the prisoner supposed that the person was about to kill him, and he slays the other in self defense. There must be an immediate apprehension of danger.
It follows from these principles, that proof that the *248 accused was insane when the crime was committed, is not enough to require the jury to acquit. It must be shown that the insanity was such as to destroy, for the time, at least, the consciousness of the distinction between right and wrong.
When such a degree of insanity is established, the people must prove, in order to convict, that when the crime was committed the insanity had at least temporarily passed away, leaving the prisoner in that condition of mind in which he was morally and legally responsible for the crime.
Proof of insane acts or declarations, that are not of a nature to indicate disease of the mind that extends to all its manifestations, or that are not in their nature permanent, fall short of establishing a defense for crime.
The insanity proved in this case produced great excitement, and it had enfeebled the prisoner’s mind ; but he was, as a general thing, capable of transacting business, of conversing in a rational manner, and of characterizing the character and conduct of his wife, and of appreciating the danger to which his child would be exposed if brought up among the associates its mother had taken up her abode with.
I am of the opinion that the learned judge gave to the jury the correct rule as to what constitutes a lucid interval, in view of the facts proved before him.
It cannot be said truthfully, that the prisoner was laboring permanently under that degree of insanity that rendered him irresponsible for crime.
The next exception of the counsel is to the instruction to the jury, that it was unnecessary for them to consider any other malice in this case than that which was implied in a premeditated design to kill.
The counsel does not claim that the law does not imply malice from the premeditated killing of a hu *249 man being ; that proposition is too well and too long established to be questioned at this day.
He does not, in terms, claim that actual malice toward the deceased should be proved, in order to justify a conviction; but his view seems to be that the killing was not premeditated, but the result of an insane impulse which he had not the power to resist.
If such was the cause of the killing, it was not, premeditated within the meaning of that term as defined by courts and writers on criminal law ; so I am unable to perceive that part of the charge excepted, could affect the prisoner injuriously.
The prisoner’s counsel offered to prove that his mother, from his childhood, spoke of him as being diseased in mind, and that he was called, in the family, crazy.
This evidence was objected to, and rejected ; and the prisoner’s counsel excepted.
The counsel has cited no case which holds such evidence admissible, except Wright v. Tatham (34 E. C. L., 178). I am unable to discover anything in that case that supports the counsel’s proposition. The question there was, whether letters found in the house of the testator, purporting to be addressed to him by third persons, were competent, in which he was addressed as compos mentis; but there was no evidence to show that he had ever answered them, or recognized them in any way ; and they were rejected. They were utterly incompetent.
It was shown in that case, that children in the street called and treated the testator as an idiot; and this evidence was held competent, not to prove the declarations made, but the manner in which the testator received them. It is on this principle that statements of third persons, not made to or in the hearing of the person alleged to be insane, are inadmissible.
The declarations or opinions of the mother are no *250 more competent, on the question of the prison’s insanity, than those of any other person. It is not one of those facts that can be proved by hearsay or reputation.
The prisoner had the benefit of the fact, that relations of his father had been insane.
The particulars of the cases were of no moment. Their insanity was an important link, in the chain of evidence to establish the prisoner’s insanity.
The similarity of symptoms or of conduct could be proved by showing the symptoms and conduct of each. But to permit a person not an expert to determine their similarity would be to permit the witness to determine the very question that was to be determined by the jury.
The prisoner’s counsel objected on the trial to the competency of the statements of the prisoner to the officers, on the morning after the murder. They were, however, received, and he excepted. If confessions or declarations- are made voluntarily, all the cases agree that they are admissible against the person making them, on the trial for the' offense to which they relate.
The difference of opinion between judges is, as to whether they were made voluntarily or under some restraint or compulsion.
It was held in People v. McMahon (15 N. Y., 386), practically overruling the case of Hendrickson v. People (10 N. Y. [6 Comst.], 13), that statements made by a person on oath, after he had been informed that he was accused of the crime in relation to which he was being examined, were not voluntary, and were, therefore, incompetent.
If that principle had been adhered to, it would be difficult to find a ground on which to admit the sworn or unsworn statements of a person who knew, when they were made, that he was accused of the crime to which his declarations related.
*251 It is said that the oath has a tendency to render the declaration involuntary ; but surely the oath cannot be presumed to have any different effect after it is known by the person accused, than it has when the statement is made, before it is known that he is accused.
If the conscience is influenced by the oath, it should be to induce the person to whom it is administered to tell the truth. A statement made, which must be assumed to be true, ought not to be rejected, and one received that is made under none of the solemnities calculated to call out the truth.
The court must adopt some other standard by which to determine when a statement is made voluntarily or involuntarily. That which has been applied for centuries is, upon the whole, the safest and the best, and most effectually protects the accused from being improperly influenced to admit his own guilt.
The case of McMahon (supra), is overruled by that of Teachout v. People (41 N. Y., 7), and the principle decided in Hendrickson v. People (supra), reaffirmed, and, it is to be hoped, permanently established as the law of the State (People v. Wentz, 37 N. Y., 304).
I am unable to understand why the declarations of the prisoner, as to his want of memory of the occurrence, on the morning of the murder, can be received, so long as his declarations in his own favor are for almost all purposes properly excluded.
The physicians testified that, in the condition of his mind and body at the time, he would be likely to forget,—it was one of the effects of the disease under which he was laboring. This was all that was admissible. What he may have said as to the forgetfulness of the transactions of the morning was wholly incompetent.
It was within the province of the court to determine the relative weight to be given to the evidence of Drs. Gray and Cooke, on the one side, and Drs. Montgom *252 cry and Whitback on the other. They were all experts,—that is, they were all either experimentally or theoretically acquainted with diseases of the mind, and the effect of epiliptic fits on the mind.
It could not require the charge of a judge to satisfy a jury that the opinions of one who had had large experience in the treatment of a particular disease, were much more reliable than those of one who only had read about it, or whose experience was very limited. The learned judge said nothing to the jury that was calculated to mislead them on this point. He submitted the degree of credit they could give to the several experts, to the jury.
The court had no right to say that the opinions of either of the witnesses were not entitled to be considered.
While I am of opinion that, for some days before the killing, the prisoner was partially insane, and at some times during that time more so than at others, there is no evidence that he was not capable of distinguishing right from wrong at any time between noon on Saturday and the commission of the crime. Indeed, we might go further, and say that at no time, except when he was in one of the epiliptic fits, is it proved that he was incapable of distinguishing right from wrong. Drs. Gray and Cook give it as their opinion, that the disordered state of mind produced by one of those fits may continue for days, and the person having it be unconscious of what is passing, notwithstanding he may act and talk rationally during the time.
If courts are to act upon this as an established fact, I do not see but that all attempts to punish such persons must be given up. If a man may be utterly insane and yet act and talk rationally, it is impossible by any test to determine where responsibility for crime *253 attaches. We may convict a person altogether incapable of committing crime.
I do not make these remarks because I doubt the correctness of the opinions of these learned and intelligent gentlemen, but to say, that while the greatest degree of care and caution must be exercised in determining the question of capacity to commit crime, yet we must hold the man responsible whose acts and declarations prove him to be so far sane as to know that the act which he commits is, by the laws of God and man, wrong. If, under this rule, a person that is irresponsible is punished, it must be submitted to, or entire immunity must be given to persons proving insanity. I am of the opinion, that the conviction was right, and should be affirmed. Judgment affirmed.
Note.—For additional cases in which knowledge between right and wrong has been declared the test of criminal responsibility, and other cases in which a defect of will, or uncontrollable impulse, has been asserted to be a ground of irresponsibility, see Macfarland’s Trial, 8 Abb. Pr. N. S., 57, and cases there cited; People v. Kleim, 1 Edm. Sel. Cas., 13, and see 6 Alb. Law J., 319. Compare U. S. v. Holmes, 1 Cliff., 68; Article on “Criminal Responsibility and Disease,’’ in 1 Law Mag. & Rev. N. S. (1872), 492; and one on “Criminal Responsibility of Insane,” Id., 215.
As to the presumption of sanity, and the benefit of a doubt on that question: Gardner v. Gardner, 22 Wend., 526; People v. Robinson, 2 Park. Cr., 649; and see 2 Keyes, 684; Cole’s Trial, 7 Abb. Pr. N. S., 322; Macfarland’s Trial, 8 Id., 57; Matter of Taylor, 1 Edm. Sel. Cas., 375; Attorney-General v. Parnthier, 3 Brown Ch., 234; Cook v. Cook, 53 Barb., 180; Ferris v. People, 35 N. Y., 125; S. C., 31 How. Pr., 140; Walter v. People, 32 N. Y., 147; People v. McCann, 16 N. Y., 58; U. S. v. Lawrence, 4 Cranch, 514; Charge of Crawford, J., in Sickles’ Case, Trial, p. 106, citing U. S. v. Devlin.
Some further details respecting the medical question involved in the case of Montgomery, are stated in a paper by Dr. Hammond. See The Journal of Psychological Medicine, 1873; and other cases in which epilepsy has been used as a defense, are there mentioned.
In November, 1872, a paper, by R. S. Guernsey, Esq., of the New York bar, entitled “ Juries and, Physicians on Questions of Insanity,” was read before the Medico-Legal Society.
*254 The writer, after quoting Dr. Maudsley’s suggestion, that “ the ground which medical men should firmly and consistently take in regard to insanity is, that it is a physical disease; that they alone are competent to decide upon its presence or absence; and that it is quite as absurd for lawyers or the general public to give their opinion on the subject in a doubtful case as it would be for them to do so in a case of fever” (Popular Science Monthly, August, 1872), says—
“The reasons for the law as it stands on this question are too little known among all classes of community.
“ As the law now is and has been for centuries, it allows and calls in the help of experts to aid in its own due administration. This is required in all questions arising in which there is supposed to be a peculiar knowledge or skill in any particular vocation, in any science, or art, or matter requiring superior knowledge. This rule is applied to questions arising in which the medical profession are supposed to have superior knowledge, and insanity is one of these questions upon which physicians are allowed to testify as to their opinion of the case under certain circumstances. The principle of allowing experts to testify as to their opinion established the maxim that ‘ Every person should be believed in his own art.’
“ The opinion of a witness is in no case evidence to be considered by a court or jury, except when the premises upon which he founds his conclusions cannot be understood by the court or jury without a study or knowledge on the special subject, or without the aid of the knowledge of persons whose skill is superior to their own. In order to be competent to testify as an expert, which means qualified to give an opinion in courts of justice on a statement of facts presented, an extra knowledge of the particular science, skill, trade or business, or other matters requiring special knowledge, must be shown. A witness of this character is not confined to the general rule, that he must state facts only, and leave the conclusions to be drawn from these facts to be determined by a court or jury; under oath he can give his opinion. These opinions or conclusions of judgment which make up such opinions of experts, are the same in substance as the verdict of a jury or judgment of a court, which is nothing more than the opinion of such jury or court as to what is established by the facts in the case. This conclusion or opinion, as is that of an expert, is given under the sanction of an oath. There is this difference, however, in the two cases; the court or jury is under oath while they are making up their opinion upon the facts in the case, and these facts upon which the opinion is predicated are also submitted to the minds of the counsel and parties. The facts were also given by the common witness under oath, upon which the jury or court makes up an opin *255 ion as to the credibility of the witness as well as of the weight of his statements. A juryman can have no private opinion, so far as his verdict is concerned. The oath he takes is ‘to try the issues joined between the parties and a true verdict give, according to the evidence.’ All he can do is to apply his general knowledge in weighing and applying the facts or professional opinions as they are presented to him by the several witnesses. The expert, on the other hand, comes to the results constituting his opinion, which is to be received in evidence, from his own private study, observation and reflection, and though the facts upon which his opinon is based may be called for by the counsel, yet from the very nature of the case it is not to be expected that the jury or court will understand them. The opinion of an expert is the private judgment of the witness given under oath. Such testimony is regarded as of great importance, but from its peculiarity and the crude shape under which it may come before the court or jury, it is to be received with great caution. As the same kinds of guards cannot be thrown around the formation of the opinions of an expert as are brought to bear upon a jury, and the opinions of experts cannot be subject to the severe scrutiny that other evidence undergoes, this kind of evidence is not of the clear and positive character or of the value of that of facts. The general rule of law, as expounded by the courts, as regards the testimony of experts, is plainly expressed in the language of the court in the case of Brehm v. Great Western Railroad Company, in New York supreme court (34 Barb., 256), as follows:
“ ‘ Great respect should be paid to the opinion of such a class of witnesses, but they are no more controlling than those of any other body of men when speaking [i. e., when the physicians are speaking,] upon subjects which lie within the range of common observation and experience.’ ”
Mr. Guernsey here cited People v. Bodine, 1 Den., 281; Wilson v. People, 2 Park. Cr., 619; Kennedy v. People, 5 Abb. Pr. N. S., 147; S. C., 39 N. Y., 245; Ramadge v. Ryan, 9 Bing., 333, as illustrations, and proceeded as follows:
“ According to the rule above stated and illustrated, should the question of sanity or insanity of a person be passed upon exclusively by physicians ? This question may best be answered by inquiring into the standard by which the subject is to be measured. This standard must be the average man, and hence what we call common sense—that is, a due regard to the usual institutions and habits of mankind. It is now undisputed that the brain is the seat of the mind, and that insanity is regarded as emanating from the brain, and hence may be caused by a physical disease affecting that organ. It is, of course, oftentimes very difficult to decide in any given case *256 whether any marked peculiarity is the result of a very active and one-sided development of the brain or of actual disease. The general principles on which all decisions of this question must be based are: That when any feeling, passion, emotion, or even a special aptitude, becomes absolutely ungovernable, so as to make its subject regardless of his own interests or of the well-being of his friends—when, as it were, it absorbs the whole being so as to blunt the reason and conscience, and' urges on to a manner of life and to. special deeds that are repugnant to the average institutions of mankind—then we have reason to suspect the existence of insanity. Although the average sentiment and experience of mankind may be an indefinite standard by which to test the sanity of an individual, it is the same standard by which physicians are to judge of it, and the same as that by which they judge that any internal organ of the body is diseased. How is it that a physician can ascertain whether his patient is suffering from dyspepsia or not ? Obviously only by comparing the symptoms that the patient exhibits and the feelings of which he complains with the symptoms and feelings experienced by the average of persons who are free from dyspepsia. In precisely the same way he becomes informed of the existence of disease in all organs of the body that are hidden from actual inspection or physical examination. The brain is enclosed in a bony covering, and cannot be inspected during life, except in some cases of injury. Diseases affecting the brain can, therefore, only be studied through the general effects, symptoms and comparisons with other persons.
“ The law presumes every man to know the consequences of his own acts, and is therefore responsible for them.
“ The questions to be decided in trials where the defense is insanity are:
“ (1.) Was the accused insane at the time of the commission of the offense?
“ (2.) Was the insanity to such a degree as to render the accused irresponsible for the particular act ?
“ (3.) Is the evidence sufficient upon which to acquit the accused on the ground of insanity ?
“ These questions are so blended that it is impossible for experts to separately examine any of them without taking the case entirely from the jury. The first one has little or no relevancy apart from the second, and the second standsupon the third, and all are to be measured, whether by physicians or jury, by the same standard—the common sense of and experience among men”
The writer then reviewed and commented on People v. Lake, 12 N. Y. [2 Kern.], 358; Trial of Rogers, 2 Greenl. Ev., § 372; McNagh *257 ten’s Case, 10 Clark & F., 210; also 2 Greenl. Ev., § 373; People v. Thurston, 2 Park. Cr., 49; O’Brien v. People, 36 N. Y., 278; Clapp v. Fullerton, 34 Id., 190; Culver v. Haslam, 7 Barb., 314; Rambler v. Tryon, 7 Serg. & R., 90; People v. Hartung, 17 How. Pr., 151; Sanchez v. People, 22 N. Y., 147, and concluded as follows:
“Physicians claim that many persons are now convicted of crime when they should only be treated for disease (see the article by Dr. Maudsley, before referred to). Juries are inclined in a too great degree, perhaps, to take the opinion of a physician of good reputation and standing as to the insanity of an individual (and none will be called for the accused unless he will so testify). This is hard to overcome by contrary testimony of experts, even if it can be obtained at all on behalf of the State, and if mere is any doubt in the minds of the jury, they lega ly ,?) give the accused the benefit of the doubt —thus practically refusing to decide ‘when doctors disagree.’
“There is no question that arises in the administration of the law where expert testimony may be less necessary, and where it should be less controlling on the jury, and where the common observation and experience of men si t. -d prevail over all theory, as in cases of alleged insanity.”.....
“If any change is suggested in the present mode of trial by jury in criminal cases (which is now guaranteed by a constitutional provision) the question of insanity should be taken from a legally irresponsible jury and in all cases placed in the hands of a responsible judiciary, with the same rules of evidence as at present.”
As to testimony of experts, see 5 Am. Law Rev., 227, 428; Taylor on Ev., 75, 83, 582, 1594, 1228-1230.
. As to testimony of non-professional witnesses on this subject, see Cram v. Cram, 33 Vt., 499; Cavendish v. Troy, 41 Id., 99, 108; Dunham’s Appeal, 27 Conn., 192; Den v. Gibbons, 2 Zabr., 117; Brickner v. Lightner, 40 Pa. St., 199; Roe v. Taylor, 45 Ill., 485; Beaubein v. Cicotle, 12 Mich., 459; State v. Pike, 49 N. H., 399; and cases there cited; Boardman v. Woodman, 47 Id., 120; Baxter v. Abbot, 7 Gray, 71; Cane v. Rich, 14 Id., 335.
As to compensation to experts as witnesses, see Webb v. Page, 1 Carr. & K., 23; Moor v. Adam, 5 M. & S., 156; Willis v. Peckham, 1 B. & B., 515; Lowry v. Doubleday, 5 M. & S., 159; Severn v. Olive, 3 B. & B., 72; 6 Moore, 235; Bailey v. Beaument, 11 Id., 497; Parkinson v. Atkinson, 31 Law J. C. P., 199; Turner v. Turner, 5 Jur. N. S., 839; 1 Greenl. Ev., § 310, note; 2 Phil. Ev., 4 ed., p. 828, note. Contract for compensation, conditional on success of suit,—void. Pollak v. Gregory, 9 Bosw., 116. Allowing compensation to witness for loss of time,—doubted. Collins v. Godefroy, 1 B. & A., 950; Lonergan v. Royal Exch. Co., 7 Bing., 729; see Phil. Ev., as above, p. 828, note.

 Present, E. D. Smith, P. J., justice of the supreme court, and James Sherry and Henry Kimble, justices of sessions.